## NEW STATE ICE CO. *v.* LIEBMANN.

No. 463. Argued February 19, 1932.—Decided March 21, 1932.

*Messrs. John B. Dudley* and *Guy L. Andrews,* with whom *Mr. J. H. Everest* was on the brief, for appellant.

264

266

*Mr. George M. Nicholson,* with whom *Messrs. Thomas H. Owen* and *M. A. Looney* were on the brief, for appellee.

MR. JUSTICE SUTHERLAND delivered the opinion of the Court.

The New State Ice Company, engaged in the business of manufacturing, selling and distributing ice under a license or permit duly issued by the Corporation Commission of Oklahoma, brought this suit against Liebmann in the federal district court for the western district of Oklahoma to enjoin him from manufacturing, selling and distributing ice within Oklahoma City without first having obtained a like license or permit from the commission. The license or permit is required by an act of the Oklahoma legislature, c. 147, Session Laws, 1925. That act declares that the manufacture, sale and distribution of ice is a public business; that no one shall be permitted to manufacture, sell or distribute ice within the state without first having secured a license for that purpose from the commission; that whoever shall engage in such business without obtaining the license shall be guilty of a misdemeanor, punishable by fine not to exceed $25, each day's violation constituting a separate offense, and that by general order of the commission, a fine not to exceed $500 may be imposed for each violation.

Section 3 of the act provides:

" That the Corporation Commission shall not issue license to any person, firm or corporation for the manufacture, sale and distribution of ice, or either of them, within this State, except upon a hearing had by said Commission at which said hearing, competent testimony and proof shall be presented showing the necessity for the manufacture, sale or distribution of ice, or either of them,

at the point, community or place desired. If the facts proved at said hearing disclose that the facilities for the manufacture, sale and distribution of ice by some person, firm or corporation already licensed by said commission at said point, community or place, are sufficient to meet the public needs therein, the said Corporation Commission may refuse and deny the applicant [application] for said license. In addition to said authority, the said Commission shall have the right to take into consideration the responsibility, reliability, qualifications and capacity of the person, firm or corporation applying for said license and of the person, firm or corporation already licensed in said place or community, as to afford all reasonable facilities, conveniences and services to the public and shall have the power and authority to require such facilities and services to be afforded the public; provided, that nothing herein shall operate to prevent the licensing of any person, firm or corporation now engaged in the manufacture, sale and distribution of ice, or either of them, in any town, city or community of this State, whose license shall be granted and issued by said Commission upon application of such person, firm or corporation and payment of license fee."

The portion of the section immediately in question here is that which forbids the commission to issue a license to any applicant except upon proof of the necessity for a supply of ice at the place where it is sought to establish the business, and which authorizes a denial of the application where the existing licensed facilities "are sufficient to meet the public needs therein." The district court dismissed the bill of complaint for want of equity, on the ground that the manufacture and sale of ice is a private business which may not be subjected to the foregoing regulation. 42 F. (2d) 913. The court of appeals affirmed. 52 F. (2d) 349.

. It must be conceded that all businesses are subject to some measure of public regulation. And that the business of manufacturing, selling or distributing ice, like that of the grocer, the dairyman, the butcher or the baker may be subjected to appropriate regulations in the interest of the public health cannot be doubted; but the question here is whether the business is so charged with a public use as to justify the particular restriction above stated. If this legislative restriction be within the constitutional power of the state legislature, it follows that the license or permit, issued to appellant, constitutes a franchise, to which a court of equity will afford protection against one who seeks to carry on the same business without obtaining from the commission a license or permit to do so. *Frost* v. *Corporation Commission,* 278 U. S. 515, 519–521. In that view, engagement in the business is a privilege to be exercised only in virtue of a public grant, and not a common right to be exercised independently (*id.*) by any competent person conformably to reasonable regulations equally applicable to all who choose to engage therein.

The *Frost* case is relied on here. That case dealt with the business of operating a cotton gin. It was conceded that this was a business clothed with a public interest, and that the statute requiring a showing of public necessity as a condition precedent to the issue of a permit was valid. But the conditions which warranted the concession there are wholly wanting here. It long has been recognized that mills for the grinding of grain or performing similar services for all comers are devoted to a public use and subject to public control, whether they be operated by direct authority of the state or entirely upon individual initiative. At a very early period a majority of the states had adopted general acts authorizing the taking and flowage, *in invitum,* of lands for their erection and maintenance. In passing these acts, the attention of the legislatures no

doubt was directed principally to grist mills; but some of the acts, either in precise terms or in their application, were extended to other kinds of mills. *Head* v. *Amoskeag Mfg. Co.*, 113 U. S. 9, 16–19; *State* v. *Edwards*, 86 Me. 102, 104–106; 29 Atl. 947. The mills were usually operated by the use of water power, but this method of operation has been said not to be essential. *State* v. *Edwards, supra,* at p. 106. It was open to the proprietor of a mill to maintain it as a private mill for grinding his own grain, and thus free from legislative control; but if the proprietor assumed to serve the general public he thereby dedicated his mill to the public use and subjected it to such legislative control as was appropriate to that status. In such cases the mills were regarded as so necessary to the existence of the communities which they served as to justify the government in fostering and maintaining them, and imposing limitations upon their operation for the protection of the public. *Id.*

In *Chickasha Cotton Oil Co.* v. *Cotton County Gin Co.*, 40 F. (2d) 846, three circuit judges passed upon the constitutionality of the Oklahoma cotton ginning act. Opinions were delivered *seriatim,* all to the effect, but for varying reasons, that the business of operating cotton gins in Oklahoma was clothed with a public interest. One of the judges thought that the rule in respect of grist mills should apply by analogy, on the ground of the similarity of service. The rule that mills whose services are open to all comers are clothed with a public interest was formulated in the light, and upon the basis, of historical usage, which had survived the limitations that otherwise might be imposed by the due process clause of the Fourteenth Amendment. While the cotton gin has no such background of ancient usage, and, as the opinion by Judge Phillips points out, there is always danger of our being led afield by relying over-much upon analogies, the analogy here is not without helpful significance.

In that connection we also may consider *Clark* v. *Nash*, 198 U. S. 361, and *Strickley* v. *Highland Boy Mining Co.*, 200 U. S. 527, which dealt with the cognate question of what is a public use in respect of which the right of eminent domain may be exercised. The cases involved a statute of the State of Utah, which declared:

" The cultivation and irrigation of the soil, the production and reduction of ores, are of vital necessity to the people of the State of Utah; are pursuits in which all are interested and from which all derive a benefit; and the use and application of the unappropriated waters of the natural streams and water courses of the State to the generation of electrical force or energy to be employed in industrial pursuits are of great public benefit and utility. So irrigation of land, the mining, milling, smelting or other reduction of ores, and such use and application of such waters for the generation of electrical power to be employed as aforesaid are hereby declared to be for the public use, and the right of eminent domain may be exercised in behalf-thereof." c. 95, §.1, Laws of Utah, 1896.

In the *Nash* case, this court, applying that statute, sustained the condemnation of a right of way across the lands of one private owner for a ditch to convey water for the purpose of irrigating the lands of another private owner. The decision was rested explicitly upon the existence of conditions peculiar to the state. These conditions are epitomized in the legislative declaration above quoted. The court said (pp. 369–370) that its decision was not to be understood as approving the broad proposition that private property might be taken in all cases where the taking might promote the public interest and tend to develop the natural resources of the state, but, having reference to the conditions there appearing, " that the use is a public one, although the taking of the right of way is for the purpose simply of thereby obtaining the water for an individual, where it is absolutely necessary to

enable him to make any use whatever of his land, and which will be valuable and fertile only if water can be obtained."

This was followed in the *Strickley* case, where, mining being one of the chief industries of the state and its development peculiarly important for the public welfare, the condemnation of a right of way for an aerial bucket line across private lands, for the purpose of transporting ores from a mine in private ownership, was upheld under the same statute.

These cases, though not strictly analogous, furnish persuasive ground for upholding the declaration of the Oklahoma legislature in respect of the public nature of cotton gins in that state. The production of cotton is the chief industry of the State of Oklahoma, and is of such paramount importance as to justify the assertion that the general welfare and prosperity of the state in a very large and real sense depend upon its maintenance. Cotton ginning is a process which must take place before the cotton is in a condition for the market. The cotton gin bears the same relation to the cotton grower that the old grist mill did to the grower of wheat. The individual grower of the raw product is generally financially unable to set up a plant for himself; but the service is a necessary one with which, ordinarily, he cannot afford to dispense. He is compelled, therefore, to resort for such service to the establishment which operates in his locality. So dependent, generally, is he upon the neighborhood cotton gin that he faces the practical danger of being placed at the mercy of the operator in respect of exorbitant charges and arbitrary control. The relation between the growers of cotton, who constitute a very large proportion of the population, and those engaged in furnishing the service, is thus seen to be a peculiarly close one in respect of an industry of vital concern to the general public. These considerations render it not unreasonable

to conclude that the business "has been devoted to a public use and its use thereby, in effect, granted to the public." *Tyson & Bro.* v. *Banton,* 273 U. S. 418, 434; *Wolff Co.* v. *Industrial Court,* 262 U. S. 522, 535, 538; same case, 267 U. S. 552, 563, *et seq.*

We have thus, with some particularity, discussed the circumstances which, so far as the State of Oklahoma is concerned, afford ground for sustaining the legislative pronouncement that the business of operating cotton gins is charged with a public use, in order to put them in contrast with the completely unlike circumstances which attend the business of manufacturing, selling and distributing ice. Here we are dealing with an ordinary business, not with a paramount industry upon which the prosperity of the entire state in large measure depends. It is a business as essentially private in its nature as the business of the grocer, the dairyman, the butcher, the baker, the shoemaker, or the tailor, each of whom performs a service which, to a greater or less extent, the community is dependent upon and is interested in having maintained; but which bears no such relation to the public as to warrant its inclusion in the category of businesses charged with a public use. It may be quite true that in Oklahoma ice is not only an article of prime necessity, but indispensable; but certainly not more so than food or clothing or the shelter of a home. And this court has definitely said that the production or sale of food or clothing cannot be subjected to legislative regulation on the basis of a public use; and that the same is true in respect of the business of renting houses and apartments, except as to temporary measures to tide over grave emergencies. See *Tyson & Bro.* v. *Banton, supra,* pp. 437–438, and cases cited.

It has been said that the manufacture of ice requires an expensive plant beyond the means of the average citizen, and that since the use of ice is indispensable, patronage

of the producer by the consumer is unavoidable. The same might, however, be said in respect of other articles clearly beyond the reach of a restriction like that here under review. But, for the moment conceding the materiality of the statement, it is not now true, whatever may have been the fact in the past. We know, since it is common knowledge, that today, to say nothing of other means, wherever electricity or gas is available (and one or the other is available in practically every part of the country), anyone for a comparatively moderate outlay may have set up in his kitchen an appliance by means of which he may manufacture ice for himself. Under such circumstances it hardly will do to say that people generally are at the mercy of the manufacturer, seller and distributer of ice for ordinary needs. Moreover, the practical tendency of the restriction, as the trial court suggested in the present case, is to shut out new enterprises, and thus create and foster monopoly in the hands of existing establishments, against, rather than in aid of, the interest of the consuming public.

Plainly, a regulation which has the effect of denying or unreasonably curtailing the common right to engage in a lawful private business, such as that under review, cannot be upheld consistently with the Fourteenth Amendment. Under that amendment, nothing is more clearly settled than that it is beyond the power of a state, " under the guise of protecting the public, arbitrarily [to] interfere with private business or prohibit lawful occupations or impose unreasonable and unnecessary restrictions upon them." *Burns Baking Co.* v. *Bryan,* 264 U. S. 504, 513, and authorities cited; *Liggett Co.* v. *Baldridge,* 278 U. S. 105, 113.

Stated succinctly, a private corporation here seeks to prevent a competitor from entering the business of making and selling ice. It claims to be endowed with state authority to achieve this exclusion. There is no question

now before us of any regulation by the state to protect the consuming public either with respect to conditions of manufacture and distribution or to insure purity of product or to prevent extortion. The control here asserted does not protect against monopoly, but tends to foster it. The aim is not to encourage competition, but to prevent it; not to regulate the business, but to preclude persons from engaging in it. There is no difference in principle between this case and the attempt of the dairyman under state authority to prevent another from keeping cows and selling milk on the ground that there are enough dairymen in the business; or to prevent a shoemaker from making or selling shoes because shoemakers already in that occupation can make and sell all the shoes that are needed. We are not able to see anything peculiar in the business here in question which distinguishes it from ordinary manufacture and production. It is said to be recent; but it is the character of the business and not the date when it began that is determinative. It is not the case of a natural monopoly, or of an enterprise in its nature dependent upon the grant of public privileges. The particular requirement before us was evidently not imposed to prevent a practical monopoly of the business, since its tendency is quite to the contrary. Nor is it a case of the protection of natural resources. There is nothing in the product that we can perceive on which to rest a distinction, in respect of this attempted control, from other products in common use which enter into free competition, subject, of course, to reasonable regulations prescribed for the protection of the public and applied with appropriate impartiality.

And it is plain that unreasonable or arbitrary interference or restrictions cannot be saved from the condemnation of that Amendment merely by calling them experimental. It is not necessary to challenge the authority of the states to indulge in experimental legislation; but

it would be strange and unwarranted doctrine to hold that they may do so by enactments which transcend the limitations imposed upon them by the federal Constitution. The principle is imbedded in our constitutional system that there are certain essentials of liberty with which the state is not entitled to dispense in the interest of experiments. This principle has been applied by this court in many cases. *Dorchy* v. *Kansas,* 264 U. S. 286; *Wolff Co.* v. *Industrial Court,* 262 U. S. 522, 267 U. S. 552; *Pierce* v. *Sisters,* 268 U. S. 510; *Nixon* v. *Herndon,* 273 U. S. 536; *Tumey* v. *Ohio,* 273 U. S. 510; *Manley* v. *Georgia,* 279 U. S. 1; *Washington* v. *Roberge,* 278 U. S. 116; *Chicago, St. P., M. & O. Ry. Co.* v. *Holmberg,* 282 U. S. 162; *Stromberg* v. *California,* 283 U. S. 359; *Near* v. *Minnesota,* 283 U. S. 697. In the case last cited the theory of experimentation in censorship was not permitted to interfere with the fundamental doctrine of the freedom of the press. The opportunity to apply one's labor and skill in an ordinary occupation with proper regard for all reasonable regulations is no less entitled to protection.

*Decree affirmed.*

MR. JUSTICE CARDOZO took no part in the consideration or decision of this case.

MR. JUSTICE BRANDEIS, dissenting.

Chapter 147 of the Session Laws of Oklahoma, 1925, declares that the manufacture of ice for sale and distribution is " a public business "; confers upon the Corporation Commission in respect to it the powers of regulation customarily exercised over public utilities; and provides specifically for securing adequate service. The statute makes it a misdemeanor to engage in the business without a license from the Commission; directs that the license shall not issue except pursuant to a prescribed written application, after a formal hearing upon adequate notice

both to the community to be served and to the general public, and a showing upon competent evidence, of the necessity " at the place desired;" and it provides that the application may be denied, among other grounds, if " the facts proved at said hearing disclose that the facilities for the manufacture, sale and distribution of ice by some person, firm or corporation already licensed by said Commission at said point, community or place are sufficient to meet the public needs therein."

Under a license, so granted, the New State Ice Company is, and for some years has been, engaged in the manufacture, sale and distribution of ice at Oklahoma City, and has invested in that business $500,000. While it was so engaged, Liebmann, without having obtained or applied for a license, purchased a parcel of land in that city and commenced the construction thereon of an ice plant for the purpose of entering the business in competition with the plaintiff. To enjoin him from doing so this suit was brought by the Ice Company. Compare *Frost* v. *Corporation Commission,* 278 U. S. 515. Liebmann contends that the manufacture of ice for sale and distribution is not a public business; that it is a private business and, indeed, a common calling; that the right to engage in a common calling is one of the fundamental liberties guaranteed by the due process clause; and that to make his right to engage in that calling dependent upon a finding of public necessity deprives him of liberty and property in violation of the Fourteenth Amendment. Upon full hearing the District Court sustained that contention and dismissed the bill. 42 F. (2d) 913. Its decree was affirmed by the Circuit Court of Appeals. 52 F. (2d) 349. The case is here on appeal. In my opinion, the judgment should be reversed.

*First.* The Oklahoma statute makes entry into the business of manufacturing ice for sale and distribution dependent, in effect, upon a certificate of public convenience

and necessity. Such a certificate was unknown to the common law. It is a creature of the machine age, in which plants have displaced tools and businesses are substituted for trades. The purpose of requiring it is to promote the public interest by preventing waste. Particularly in those businesses in which interest and depreciation charges on plant constitute a large element in the cost of production, experience has taught that the financial burdens incident to unnecessary duplication of facilities are likely to bring high rates and poor service.[1] There, cost is usually dependent, among other things, upon volume; and division of possible patronage among competing concerns may so raise the unit cost of operation as to make it impossible to provide adequate service at reasonable rates. The introduction in the United States of the certificate of public convenience and necessity marked the growing conviction that under certain circumstances free competition might be harmful to the community and that, when it was so, absolute freedom to enter the business of one's choice should be denied.

Long before the enactment of the Oklahoma statute here challenged a like requirement had become common in the United States in some lines of business. The certificate was required first for railroads; then for street railways; then for other public utilities whose operation is dependent upon the grant of some special privilege.[2]

[1] Compare Sumner H. Slichter, "Modern Economic Society," p. 56, 326–328; Eliot Jones and T. C. Bigham, "Principles of Public Utilities," p. 70; Eliot Jones, "Is Competition in Industry Ruinous," 34 Quarterly Journal of Economics, 473, 488.

[2] See Ford P. Hall, "Certificates of Convenience and Necessity," 28 Mich. L. Rev. 107, 276; Waldo O. Willhoft, "Certificates of Convenience and Necessity in Michigan," 10 Mich. State Bar Journal 257; Charles S. Hyneman, "Public Encouragement of Monopoly in the Utility Industries," Annals of American Academy of Political and Social Science, January, 1930, p. 160; 24 Col. L. Rev. 528. Professor Hall lists statutes of forty-three states, most of them

Latterly, the requirement has been widely extended to common carriers by motor vehicle which use the highways, but which, unlike street railways and electric light companies, are not dependent upon the grant of any special privilege.[3] In Oklahoma the certificate was required, as early as 1915, for cotton gins—a business then declared a public one, and, like the business of manufacturing ice, conducted wholly upon private property. Sess. Laws, 1915, c. 176, § 3. See *Frost* v. *Corporation Commission*, 278 U. S. 515, 517. As applied to public utilities, the validity under the Fourteenth Amendment of the requirement of the certificate has never been successfully questioned.

*Second.* Oklahoma declared the business of manufacturing ice for sale and distribution a " public business; " that is, a public utility. So far as appears, it was the first State to do so.[4] Of course, a legislature cannot by

---

enacted within the last 20 years, requiring a certificate for the operation of various classes of public utilities. Before the advent of the certificate of public convenience and necessity, similar but less flexible control over the entry of many public utilities into business was exercised through the grant of franchises, municipal or state. See Eliot Jones and T. C. Bigham, " Principles of Public Utilities," c. III. The certificate was first introduced into federal law by the Transportation Act, 1920, c. 91, § 402, pars. 18–20, 41 Stat. 456, 477. Compare Thomas H. Kennedy, " The Certificate of Convenience and Necessity Applied to Air Transportation," 1 Journal of Air Law 76.

[3] See D. E. Lilienthal and I. S. Rosenbaum, " Motor Carrier Regulation by Certificates of Necessity and Convenience," 36 Yale L. J. 163, " Motor Carrier Regulation: Federal, State, and Municipal," 26 Col. L. Rev. 954. Compare LaRue Brown and S. N. Scott, " Regulation of the Contract Motor Carrier Under the Constitution," 44 Harv. L. Rev. 530.

[4] Such a law has since been passed in Arkansas. Ark. Acts, 1929, No. 55. The State court held that the measure violated the State constitution insofar as it sanctioned denial of the right to engage in the ice business. *Cap. F. Bourland Ice Co.* v. *Franklin Utilities Co.*, 180 Ark. 770; 22 S. W. (2d) 993. The provisions for the regulation of rates, attacked under the Fourteenth Amendment, were sustained.

mere legislative fiat convert a business into a public utility. *Producers Transportation Co.* v. *Railroad Commission,* 251 U. S. 228, 230. But the conception of a public utility is not static.[5] The welfare of the community may require that the business of supplying ice be made a public utility, as well as the business of supplying water or any other necessary commodity or service. If the business is, or can be made, a public utility, it must be possible to make the issue of a certificate a prerequisite to engaging in it.

Whether the local conditions are such as to justify converting a private business into a public one is a matter primarily for the determination of the state legislature. Its determination is subject to judicial review; but the usual presumption of validity attends the enactment.[6]

See 15 St. Louis L. Rev. 414. Bills declaring the business of manufacturing ice a public utility have been introduced in Kansas, Louisiana, Michigan, New York, and Texas. See 70 Ice & Refrigeration 425; 72 *id.* 172, 239; 74 *id.* 110; 76 *id.* 216, 217; H. P. Hill, " Commission Control of the Ice Industry," *ibid.* 80.

[5] " Neither is it a matter of any moment that no precedent can be found for a statute precisely like this. It is conceded that the business is one of recent origin, that its growth has been rapid, and that it is already of great importance. . . . It presents, therefore, a case for the application of a long-known and well-established principle in social science, and this statute simply extends the law so as to meet this new development of commercial progress." *Munn* v. *Illinois,* 94 U. S. 113, 133. See Thomas P. Hardman, " Public Utilities," 37 W. Va. L. Q. 250.

[6] *O'Gorman & Young, Inc.* v. *Hartford Fire Ins. Co.,* 282 U. S. 251. " Every possible presumption is in favor of the validity of a statute, and this continues until the contrary is shown beyond a rational doubt. One branch of the government can not encroach upon the domain of another without danger. The safety of our institutions depends in no small degree on a strict observance of this salutary rule." *Sinking-Fund Cases,* 99 U. S. 700, 718. See also *Legal Tender Cases,* 12 Wall. 457, 531; *Trade-Mark Cases,* 100 U. S. 82, 96. See James B. Thayer, " The Origin and Scope of the American Doctrine of Constitutional Law," 7 Harv. L. Rev. 129, 142.

The action of the State must be held valid unless clearly arbitrary, capricious or unreasonable. " The·legislature being familiar with local conditions is, primarily, the judge of the necessity of such enactments. The mere fact that a court may differ with the legislature in its views of public policy, or that judges may hold views inconsistent with the propriety of the legislation in question, affords no ground for judicial interference, . . ." *McLean* v. *Arkansas*, 211 U. S. 539, 547. Whether the grievances are real or fancied, whether the remedies are wise or foolish, are not matters about which the Court may concern itself.[7] " Our present duty is to pass. upon the statute before us, and if it has been enacted upon a belief of evils that is not arbitrary we cannot measure their extent against the estimate of the legislature." *Tanner* v. *Little*, 240 U. S. 369, 385. A decision that the legislature's belief of evils was arbitrary, capricious and unreasonable may not be made without enquiry into the facts with reference to which it acted.

*Third.* Liebmann challenges the statute—not an order of the Corporation Commission. If he had applied for a license and been denied one, we should have been obliged to enquire whether the evidence introduced before

---

[7] " Whether the enactment is wise or unwise, whether it is based on sound economic theory, whether it is the best means to achieve the desired result, whether, in short, the legislative discretion within its prescribed limits should be exercised in a particular manner, are matters for the judgment of the legislature, and the earnest conflict of serious opinion does not suffice to bring them within the range of judicial cognizance." *Chicago, B. & Q. R. Co.* v. *McGuire*, 219 U. S. 549, 569.

" Questions of policy are not submitted to judicial determination, and the courts have no general authority of supervision over the exercise of discretion which under our system is reposed in the people or other departments of government." *Green* v. *Frazier*, 253 U. S. 233, 240. See also *Price* v. *Illinois*, 238 U. S. 446, 451, 452; *Rast* v. *Van Deman & Lewis Co.*, 240 U. S. 342, 357; *Merrick* v. *N. W. Halsey & Co.*, 242 U. S. 568, 586, 587.

the Commission justified it in refusing permission to establish an additional ice plant in Oklahoma City. As he did not apply but challenges the statute itself, our enquiry is of an entirely different nature. Liebmann rests his defense upon the broad claim that the Federal Constitution gives him the right to enter the business of manufacturing ice for sale even if his doing so be found by the properly constituted authority to be inconsistent with the public welfare. He claims that, whatever the local conditions may demand, to confer upon the Commission power to deny that right is an unreasonable, arbitrary and capricious restraint upon his liberty.

The function of the Court is primarily to determine whether the conditions in Oklahoma are such that the legislature could not reasonably conclude (1) that the public welfare required treating the manufacture of ice for sale and distribution as a "public business"; and (2) that in order to ensure to the inhabitants of some communities an adequate supply of ice at reasonable rates it was necessary to give the Commission power to exclude the establishment of an additional ice plant in places where the community was already well served. Unless the Court can say that the Federal Constitution confers an absolute right to engage anywhere in the business of manufacturing ice for sale, it cannot properly decide that the legislators acted unreasonably without first ascertaining what was the experience of Oklahoma in respect to the ice business. The relevant facts appear, in part, of record. Others are matters of common knowledge to those familiar with the ice business. Compare *Muller* v. *Oregon*, 208 U. S. 412, 419, 420. They show the actual conditions, or the beliefs, on which the legislators acted. In considering these matters we do not, in a strict sense, take judicial notice of them as embodying statements of uncontrovertible facts. Our function is only to determine the reasonableness of the legislature's belief in the existence of evils and in the effectiveness of the remedy

provided. In performing this function we have no occasion to consider whether all the statements of fact which may be the basis of the prevailing belief are well-founded; and we have, of course, no right to weigh conflicting evidence.

(A) In Oklahoma a regular supply of ice may reasonably be considered a necessary of life, comparable to that of water, gas and electricity. The climate, which heightens the need of ice for comfortable and wholesome living, precludes resort to the natural product.[8] There, as elsewhere, the development of the manufactured ice industry in recent years[9] has been attended by deep-seated alterations in the economic structure and by radical changes in habits of popular thought and living. Ice has come to be regarded as a household necessity, indispensable to the preservation of food and so to economical household management and the maintenance of health.[10] Its com-

[8] The mean normal temperature in the State from May to September is 76.4 degrees. Climatological Data, United States Weather Bureau, vol. xxxix, 193, No. 13, p. 53. The mean normal temperature in January, the coldest month, is 38.3 degrees; in December, 39.2 degrees. *Ibid.* So far as appears, no natural ice is harvested in the State for commercial purposes. See Guy L. Andrews, " State Regulation of Ice Industry in Oklahoma," Refrigerating World, Sept. 1928, p. 32.

[9] The industry first assumed commercial importance in the United States about 1880. See Ice and Refrigeration Blue Book (10th ed.), pp. 12–18. Reports of the Bureau of the Census indicate that in 1869 there were only four establishments producing artificial ice; in 1879, 35; in 1889, 222; in 1899, 775. See Willard L. Thorp, " The Integration of Industrial Operation," United States Census Monographs, III, 1924, pp. 49, 50. In 1929, the Census of Manufactures shows 4,110 establishments making ice as their product of chief value. The Ice and Refrigeration Blue Book for 1927, p. 30, lists 7,338 plants actually producing ice for sale. It estimates the total production for that year at 52,202,160 tons, as against 4,294,439 tons, reported by the Bureau of the Census for 1899.

[10] See Report of Committee on Fundamental Equipment submitted to the President's Conference on Home Building and Home Owner-

mercial uses are extensive. In urban communities, they absorb a large proportion of the total amount of ice manufactured for sale.[11] The transportation, storage and distribution of a great part of the nation's food supply is dependent upon a continuous, and dependable supply of ice.[12] It appears from the record that in certain parts of Oklahoma a large trade in dairy and other products has

ship, December 3, 1931, p. 107; Elsie P. Wolcott, " Use and Cost of Ice in Families with Children," published by the Department of Public Welfare of the City of Chicago. Lack of ice, in hot seasons, results in constant waste and danger to health. It compels the purchase of food in small quantities at higher prices. The intimate relation of food preservation to health, and infant mortality, has long been recognized. Ordinary perishable foodstuffs, it is generally considered, cannot be safely kept at temperatures in excess of from 45 to 50 degrees. Report of Committee on Fundamental Equipment, *supra,* p. 110.

[11] See Walter R. Sanders, " Industrial Application of Refrigeration in the United States," Proceedings of the Fourth International Congress of Refrigeration, London, 1924, p. 967. It was testified that in Oklahoma City in April, 1930, 46.4 per cent. of the sales of ice were to the retail trade, 37.12 per cent. to the commercial trade, 13.81 per cent. to the wholesale trade, 2.92 per cent. for car icing, and the remainder for carload shipments out of the city. In 1922 there were loaded in Oklahoma 1676 cars of food products under refrigeration; in 1925, 2940 cars; and in 1929, 3347. The Ice and Refrigeration Blue Book (10th ed.), pp. 22, 23, lists 198 industries using refrigeration. In a great number of these it is impracticable to install a private ice plant.

[12] Were it not for refrigeration, the market for perishable foodstuffs, in warm seasons, would be limited in area to a few miles and in time to a few days, or even hours. A considerable part of this refrigeration is supplied by concerns manufacturing ice for sale. Such concerns commonly supply ice used in car-icing. Mechanical refrigeration is beyond the means of many small retail dealers. Moreover, since decay in food, once begun, cannot be arrested by subsequent refrigeration, ice, or a substitute, is often essential on the farm. See M. E. Pennington and A. D. Greenlee, " The Refrigeration of Dressed Poultry in Transit," Bulletin No. 17, U. S. Department of Agriculture, p. 31.

been built up as a result of rulings of the Corporation Commission under the Act of 1925, compelling licensed manufacturers to serve agricultural communities; [13] and that this trade would be destroyed if the supply of ice were withdrawn.[14] We cannot say that the legislature of Oklahoma acted arbitrarily in declaring that ice is an article of primary necessity, in industry and agriculture as well as in the household, partaking of the fundamental character of electricity, gas, water, transportation and communication.

Nor can the Court properly take judicial notice that, in Oklahoma, the means of manufacturing ice for private use are within the reach of all persons who are dependent upon it. Certainly it has not been so. In 1925 domestic mechanical refrigeration had scarcely emerged from the experimental stage.[15] Since that time, the production and consumption of ice manufactured for sale, far from

[13] More than 80 per cent. of the milk and cream sold from farms in the United States is produced in sections where natural ice can be harvested. See U. S. Department of Agriculture, " Cooling Milk and Cream on the Farm," Farmers' Bulletin No. 976, p. 1. The dairy industry in Oklahoma, however, is wholly dependent upon artificial ice, or its substitutes. Refrigeration on the farm is indispensable to the safe marketing of dairy products, at any season when the temperature exceeds 50 degrees. See John T. Bowen, " The Application of Refrigeration to the Handling of Milk," Bulletin No. 98, U. S. Department of Agriculture, pp. 2, 65 *et seq.*

[14] The power of the Commission to compel this service, of course, depends upon the status of the ice business as a public utility. The evidence shows that the distribution of ice in rural communities not themselves possessing ice plants has developed almost wholly since the passage of the Act of 1925. There was testimony that such distribution would be impracticable without the protection afforded by the Act.

[15] The total number of household refrigerators in the entire country manufactured and sold before 1920 was approximately 10,000. In 1924, the annual production reached 30,000; in 1925, 75,000. Electrical Refrigerating News, February 17, 1932.

diminishing, has steadily increased.[16]   In Oklahoma the mechanical household refrigerator is still an article of relative luxury.[17]   Legislation essential to the protection of individuals of limited or no means is not invalidated by the circumstance that other individuals are financially able to protect themselves. . The businesses of power companies and of common carriers by street railway, steam railroad or motor vehicle fall within the field of public control, although it is possible, for a relatively modest outlay, to install individual power plants, or to purchase ·

---

[16] The Secretary of the National Association of Ice Industries testified that the ice business for the last eleven years had increased upon an average of 5.35 per cent. each year; that in 1919 the per capita consumption of ice was 712 pounds; in 1929, 1157 pounds.  A great deal of the increase in consumption of ice in Oklahoma, another witness testified, was in rural communities and among urban dwellers of the poorer classes.

[17] The number of domestic electric meters installed in Oklahoma as of August 31, 1930, was only 222,237, according to a tabulation of the Bureau of Foreign and Domestic Commerce.  The population of the State in 1930 was 2,396,000.  Fifteenth Census, vol. I, p. 18.  It is estimated that 965,000 household refrigerators were sold in 1931, of which only 10,146 were sold in Oklahoma.  Electrical Refrigerating News, February 24, 1932.  Approximately 3,578,000 such refrigerators are now in use throughout the country.  Id., February 10, 1932.  From these figures it may be calculated that the number of refrigerators in use in Oklahoma is between 35,000 and 40,000.  The average cost of a household electric refrigerator in 1925 was $425; in 1931, $245.  Electrical Refrigerating News, February 17, 1932.  The price of ice for domestic use in Oklahoma varies from 40 to 70 cents the hundredweight.  Few families use as much as three or four tons of ice in a year.  In view of these facts, this Court can scarcely have judicial knowledge that in Oklahoma all families or businesses which are able to purchase ice are able to purchase a mechanical refrigerator.  See Report of Committee on Fundamental Equipment, submitted to the President's Conference on Home Building and Home Ownership, pp. 111, 128–129.  This Committee found it impossible to recommend even an ordinary refrigerator, using ice, for families of low income, and suggested the design and marketing of a specially constructed ice-chest.

motor vehicles for private carriage of passengers or goods. The question whether in Oklahoma the means of securing refrigeration otherwise than by ice manufactured for sale and distribution has become so general as to destroy popular dependence upon ice plants is one peculiarly appropriate for the determination of its legislature and peculiarly inappropriate for determination by this Court, which cannot have knowledge of all the relevant facts.

The business of supplying ice is not only a necessity, like that of supplying food or clothing or shelter, but the legislature could also consider that it is one which lends itself peculiarly to monopoly.[18] Characteristically the business is conducted in local plants with a market narrowly limited in area,[19] and this for the reason that ice

_____

[18] It is noteworthy that the ice industry has the characteristic of uniformity of product or service common to most public utilities, and distinguishing it from other businesses in which differences in quality or style make difficult effective regulation. See S. Howard Patterson and Karl W. H. Scholz, "Economic Problems of Modern Life," (2d ed. 1931), p. 426.

The tendency of the industry to be conducted as a public utility is reflected in the widespread entry into it in recent years of electrical, gas, and water utilities, and the like. Such companies in Oklahoma operate more than one-third of the ice plants. See Ice and Refrigeration Blue Book (10th ed.), pp. 1268-88. Compare *Oklahoma Light & Power Co.* v. *Corporation Commission,* 96 Okla. 19, 24; 220 Pac. 54.

Municipalities have engaged extensively in the business of manufacturing and selling ice in foreign countries, and to a lesser extent in the United States. On several occasions, departments of the Federal Government, unable to secure ice at what were regarded as reasonable prices, have installed their own ice plants. Both in the Philippine Islands and in Panama plants have been operated which sell ice to government employees. See Carl D. Thompson, "Public Ownership," pp. 301-305; Jeanie Wells Wentworth, "A Report on Municipal and Government Ice Plants," submitted to the Borough President of Manhattan, December 15, 1913.

[19] See Willard L. Thorp, "The Integration of Industrial Operation," United States Census Monographs, III, 1924, pp. 49, 50. Neither consolidation of ownership nor increase in production has had the

manufactured at a distance cannot effectively compete with a plant on the ground.[20]   In small towns and rural communities [21] the duplication of plants, and in larger communities the duplication of delivery service,[22] is wasteful and ultimately burdensome to consumers.  At the same time the relative ease and cheapness with which an ice plant may be constructed exposes the industry to destructive and frequently ruinous competition.  Competition in the industry tends to be destructive because ice plants have a determinate capacity, and inflexible fixed charges and operating costs, and because in a market of limited area the volume of sales is not readily expanded.  Thus, the erection of a new plant in a locality already adequately served often causes managers to go to extremes in cutting prices in order to secure business.  Trade journals and reports of association meetings of ice manufacturers bear ample witness to the hostility of the industry to such com-

effect of greatly increasing the size of plants in the ice business. Thus in Oklahoma in 1927 there were only twenty plants manufacturing ice for sale which had a capacity exceeding 200 tons a day, of which eight were in Oklahoma City and Tulsa.  Ice and Refrigeration Blue Book (10th ed.), pp. 1268-1288.

[20] Several reasons were given in the testimony for this localization of the ice business.  Freight rates on ice are high in proportion to value.  Handling charges are doubled if the ice is put in cold storage at the point of consignment; and, if kept in the car, the ice loses in weight and deteriorates in quality during the period of a week or more before a carload will be exhausted in a small community. Shrinkage of course varies with the weather, but is at all times considerable.

[21] Oklahoma is predominantly a state of rural population.  Only 34.3% of its inhabitants live in towns or cities of more than 2,500. Fifteenth Census of the United States, vol. I, p. 15.  It has only four cities over 25,000; 12 cities from 10,000 to 25,000; and 52 cities from 2,500 to 10,000.  There are 444 incorporated places of less than 2,500.  *Ibid.*, pp. 895-98.

[22] See Editorials, Refrigerating World, May, 1928, p. 5, June 1, 1928, p. 6; J. H. Reed, "Consolidate Ice Delivery in Atlanta," *id.*, May, 1928, p. 15.

petition, and to its unremitting efforts, through trade associations, informal agreements, combination of delivery systems, and in particular through the consolidation of plants, to protect markets and prices against competition of any character.[23]

That these forces were operative in Oklahoma prior to the passage of the Act under review, is apparent from the record. Thus, it was testified that in only six or seven localities in the State containing, in the aggregate, not more than 235,000 of the total population of approximately 2,000,000, was there " a semblance of competition ";[24] and that even in those localities the prices of ice were ordinarily uniform. The balance of the population was, and still is, served by companies enjoying complete monopoly. Compare *Munn* v. *Illinois*, 94 U. S. 113, 131, 132; *Sinking Fund Cases*, 99 U. S. 700, 747; *Wabash, St. L. & P. Ry. Co.* v. *Illinois*, 118 U. S. 557, 569; *Spring Valley Water Works* v. *Schottler*, 110 U. S. 347, 354; *Budd* v. *New York*, 143 U. S. 517, 545; *Wolff Co.* v. *Industrial Court*, 262 U. S. 522, 528. Where there was competition, it often resulted to the disadvantage rather

---

[23] See *e. g.*, John Nickerson, " Consolidations in the Ice Industry," 73 Ice & Refrigeration 333, 334; 69 *id*. 223; 70 *id*. 357; 72 *id*. 39; *ibid*. 282; Halbert P. Hill, " The Effect of Recent Mergers on the Ice Industry," Refrigerating World, February, 1926, pp. 15, 42; W. F. Stevens, " What the Future Holds for the Ice Manufacturer," 76 Ice & Refrigeration 81, 82; W. L. Foushee, " The Ice Business as a Public Utility," *ibid*. 302. See Tipton *v*. Ada Ice & Fuel Co., 2d & 3d Ann. Rep. Okla. Corp. Comm., p. 358.

[24] The Ice and Refrigeration Blue Book for 1927 shows that of 142 communities containing ice plants manufacturing ice for sale, at least 112 were served either by a single plant or by several plants of common ownership. See pp. 1268–1288, 1645 *et seq*. There is evidence in the record that it was common practice for manufacturing establishments of different ownership, to make use of a jointly-owned delivery company. Out of 217 plants listed as engaged in manufacturing ice for sale, 101 were owned by corporations owning or controlling other plants within or without the State. *Ibid*.

than the advantage of the public, both in respect to prices and to service. Some communities were without ice altogether, and the State was without means of assuring their supply. There is abundant evidence of widespread dissatisfaction with ice service prior to the Act of 1925,[25] and of material improvement in the situation subsequently. It is stipulated in the record that the ice industry as a whole in Oklahoma has acquiesced in and accepted the Act and the status which it creates.

(B) The statute under review rests not only upon the facts just detailed but upon a long period of experience in more limited regulation dating back to the first year of Oklahoma's statehood. For 17 years prior to the passage of the Act of 1925, the Corporation Commission under § 13 of the Act of June 10, 1908, had exercised jurisdiction over the rates, practices and service of ice plants, its action in each case, however, being predicated upon a finding that the company complained of enjoyed a "virtual monopoly" of the ice business in the community which it served.[26] The jurisdiction thus exer-

---

[25] For accounts of the situation in Oklahoma before the passage of the bill, see Guy L. Andrews, "Regulation of the Ice Business in Oklahoma," 75 Ice & Refrigeration 171, "State Regulation of the Ice Industry," ibid., 437. In the year 1924, 375 formal complaints against ice companies are said to have been filed with the Commission.

[26] Okla. Sess. Laws, 1907–1908, c. 83: "Section 13. Whenever any business, by reason of its nature, extent or the existence of a virtual monopoly therein, is such that the public must use the same, or its services, or the consideration by it given or taken or offered, or the commodities bought or sold therein are offered or taken by purchase or sale in such a manner as to make it of public consequence, or to affect the community at large as to supply, demand or price or rate thereof, or said business is conducted in violation of the first section of this Act, said business is a public business, and subject to be controlled by the State, by the Corporation Commission or by an action in any district court of the State, as to all of its practices, prices, rates and charges. And it is hereby declared to be the duty of any person, firm or corporation engaged in any public business to render its

cised was upheld by the Supreme Court of the State in *Oklahoma Light & Power Co. v. Corporation Commission*, 96 Okla. 19; 220 Pac. 54. The court said, at p. 24: " The manufacture, sale, and distribution of ice in many respects closely resemble the sale and distribution of gas as fuel, or electric current, and in many communities the same company that manufactures, sells, and distributes electric current is the only concern that manufactures, sells, and distributes ice, and by reason of the nature and extent of the ice business it is impracticable in that community to interest any other concern in such business. In this situation, the distributor of such a necessity as ice should not be permitted by reason of the impracticability of any one else engaging in the business to charge unreasonable prices, and if such an abuse is persisted in, the regulatory power of the State should be invoked to protect the public." See also *Consumers Light & Power Co. v. Phipps*, 120 Okla. 223; 251 Pac. 63.

By formal orders, the Commission repeatedly fixed or approved prices to be charged in particular communities;[27] required ice to be sold without discrimination[28]

---

services and offer its commodities, or either, upon reasonable terms without discrimination and adequately to the needs of the public, considering the facilities of said business.''

[27] Powers *v.* Mangum Ice & Cold Storage Co., 2d & 3d Ann. Rep. Okla. Corp. Comm., p. 354; Tipton *v.* Ada Ice & Fuel Co., *ibid.*, p. 358; Scanlon *v.* Sass, *ibid.*, p. 361; Worley *v.* Hill, *ibid.*, p. 390; Gillian *v.* Tishomingo Electric Light & Power Co., 4th Ann. Rep., p. 103; Wadlington *v.* Southern Ice & Utilities Co., 13th Ann. Rep., p. 235; In re General Investigation of Prices, Practices, Rates and Charges of the New State Ice Co., 15th Ann. Rep., p. 176; In re General Investigation of Prices, Practices, Rates and Charges of the Steffens-Bretch Ice & Ice Cream Co., *ibid.*, p. 177; McCartney *v.* Kingfisher Ice Co., *ibid.*, p. 210; In the Matter of the investigation of prices charged for ice at Guthrie, Oklahoma, by the Rummeli-Braun Co., *ibid.*, p. 212.

[28] Brenan v. Tishomingo Ice & Cold Storage Co., 2d & 3d Ann. Rep. Okla. Corp. Comm., p. 353; Tipton *v.* Ada Ice & Fuel Co.,

and to be distributed as equitably as possible to the extent of the capacity of the plant; [29] forbade short weights and ordered scales to be carried on delivery wagons and ice to be weighed upon the customer's request; [30] and undertook to compel sanitary practices in the manufacture of ice [31] and courteous service of patrons.[32] Many of these regulations, other than those fixing prices, were embodied in a general order to all ice companies, issued July 15, 1921, and are still in effect.[33] Informally, the Commis-

*ibid.*, p. 358; Scanlon *v.* Sass, *ibid.,* p. 361; Order No. 472, 4th Ann. Rep., p. 40; Nunnery *v.* Mangum Ice & Cold Storage Co., *ibid.*, p. 63; Order No. 641, 6th Ann. Rep., p. 7; Order No. 650, *ibid.*, p. 8; Order No. 708, *ibid.*, p. 10; Garner *v.* Tulsa Ice Co., 10th Ann. Rep., p. 336; Ratner *v.* Imperial Ice Co., 11th Ann. Rep., p. 205; Norton *v.* Chandler Ice Co., 12th Ann. Rep., p. 227; Vance *v.* Tahlequah Light & Power Co, 13th Ann. Rep., p. 194.

[29] In most instances of complaint of insufficient ice the Commission undertook to secure only the equitable distribution of the available supply; and the terms of the statute gave it no greater authority. See, *e. g.*, Powers *v.* Mangum Ice & Cold Storage Co., 2d & 3d Ann. Rep. Okla. Corp. Comm., p. 354; Gardiner *v.* Geary Light & Ice Co., *ibid.*, p. 403. But compare Ratner *v.* Imperial Ice Co., 11th Ann. Rep., p. 205; Ada *v.* Tipton Ice & Fuel Co., 2d & 3d Ann. Rep., p. 358. On no occasion, before 1925, did the Commission undertake to extend ice service to communities not theretofore supplied.

[30] Brenan *v.* Tishomingo Ice & Cold Storage Co., 2d & 3d Ann. Rep. Okla. Corp. Comm., p. 353; Powers *v.* Mangum Ice & Cold Storage Co., *ibid.*, p. 354; Tipton *v.* Ada Ice & Fuel Co., *ibid.*, p. 358; Scanlon *v.* Sass, *ibid.*, p. 361; Worley *v.* Hull, *ibid.*, p. 390; Ralston *v.* Hobart Ice & Bottling Co., 4th Ann. Rep., p. 110; In the Matter of Proposed Order No. 94, 6th Ann. Rep., p. 219, 7th *id.*, p. 266; Langan *v.* McCoy Bros., 8th & 9th Ann. Rep., p. 226; Ratner *v.* Imperial Ice Co., 11th Ann. Rep., p. 205; Norton *v.* Chandler Ice Co., 12th Ann. Rep., p. 227; Vance *v.* Tahlequah Light & Power Co., 13th Ann. Rep., p. 194.

[31] Gardiner v. Geary Light & Ice Co., 2d & 3d Ann. Rep. Okla. Corp. Comm., p. 403.

[32] Worley *v.* Hull, 2d & 3d Ann. Rep. Okla. Corp. Comm., p. 390.

[33] Order No. 1906, 15th Ann. Rep. Okla. Corp. Comm., p. 178.

sion adjusted a much greater volume of complaints of a similar nature.[34] It appears from the record that for some years prior to the Act of 1925 one day of each week was reserved by the Commission to hear complaints relative to the ice business.

As early as 1911, the Commission in its annual report to the Governor, had recommended legislation more clearly delineating its powers in this field:

" There should be a law passed putting the regulation of ice plants under the jurisdiction of the Commission. The Commission is now assuming this jurisdiction under an Act passed by the Legislature known as the anti-trust law. A specific law upon this subject would obviate any question of jurisdiction." [35]

This recommendation was several times repeated, in terms revealing the extent and character of public complaint against the practices of ice companies.[36]

---

[34] See 8th & 9th Ann. Rep. Okla. Corp. Comm., p. 1.

[35] 2d & 3d Ann. Rep. Okla. Corp. Comm., p. 8.

[36] In its Eighth and Ninth Annual Report, dated November 20, 1916, p. 5, the Commission said: " The scope of legislation pertaining to those utilities which serve the public generally should be broadened. Two conspicuous examples are ice plants and cotton compresses. Chapter 93, Session Laws, 1915, extends the jurisdiction of the Corporation Commission over water, heat, light, and power companies, but does not include ice plants. Numerous complaints are received by the Commission each year as to extortionate practices of ice companies and exorbitant prices charged. The same jurisdiction should be given the Corporation Commission over ice plants as it exercises over gas, electric and water companies."

In its Eleventh Annual Report, October 3, 1918, p. xxii, it was said: " The business of manufacturing and distributing ice is as much a matter of public concern as is the business of rendering water, electric or gas service and should be subject to the same regulation. Complaints are continuously being made to the Commission in reference to prices of ice, practices of ice companies, or service rendered by such companies, and the Commission has frequently been called upon to exercise jurisdiction under the so-called Anti-Trust Laws. Specific legislation should be enacted in reference to these

The enactment of the so-called Ice Act in 1925 enlarged the existing jurisdiction of the Corporation Commission by removing the requirement of a finding of virtual monopoly in each particular case, compare *Budd* v. *New York,* 143 U. S. 517, 545, with *Brass* v. *Stoeser,* 153 U. S. 391, 402, 403; by conferring the same authority to compel adequate service as in the case of other public utilities; and by committing to the Commission the function of issuing licenses equivalent to a certificate of public convenience and necessity. With the exception of the granting and denying of such licenses and the exertion of wider control over service, the regulatory activity of the Commission in respect to ice plants has not changed in character since 1925. It appears to have diminished somewhat in volume.[37]

---

companies and the power of regulation should be made definite and certain."

Again, in the Twelfth Annual Report, November 18, 1919, p. 1: " During the past summer season numerous complaints against practices and rates of ice utilities have arisen from at least a hundred towns and cities throughout the State. The same jurisdiction should be given the Corporation Commission over ice plants as it exercises over gas, electric, and water companies."

[37] Besides continuing in effect Order No. 1906, *supra* note 33, the Commission has issued further general orders pertaining particularly to accounting practices. Order No. 3843, 20th Ann. Rep. Okla. Corp. Comm., p. 562. In the following cases it has prescribed rates: In re Application of Marietta Ice & Water Co., 22d Ann. Rep., p. 601; In re Application for Reduction in Ice Rates Charged by the Sallisaw Ice Co., *ibid.,* p. 816; In re Reduction of Rates Charged by the Consumers Ice Co., *ibid.,* p. 859; In re Application of Southwestern Light & Power Co., 23d Ann. Rep. p. 755; In re Application of the Ward Ice Industries for Reduction in Ice Rates, *ibid.,* p. 757. In In re Application of the Shawnee Ice Co. for increase of capacity in its plant, 22d Ann. Rep., p. 834, the applicant was allowed to withdraw its application, and the intervening application of E. A. Liebemann to erect a new plant was denied. In Burbank Ice Co. v. Kaw City Ice & Power Co., 23d Ann. Rep., p. 558, the defendant's permit to

In 1916, the Commission urged, in its report to the Governor, that all public utilities under its jurisdiction be required to secure from the Commission "what is known as a 'certificate of public convenience and necessity' before the duplication of facilities."

"This would prevent ruinous competition resulting in the driving out of business of small though competent public service utilities by more powerful corporations, and often consequent demoralization of service, or the requiring of the public to patronize two utilities in a community where one would be adequate." [38]

Up to that time a certificate of public convenience and necessity to engage in the business had been applied only to cotton gins. Okla. Sess. Laws, 1915, c. 176, § 3. In 1917 a certificate from the Commission was declared prerequisite to the construction of new telephone or telegraph lines.[39] In 1923 it was required for the operation of motor carriers.[40] In 1925, the year in which the Ice Act was passed, the requirement was extended also to power, heat, light, gas, electric or water companies pro-

distribute ice in the town of Shidler was revoked upon a showing that it distributed during the summer months only and that the plaintiff's local plant was operated throughout the year, was adequate to meet local needs, and could not be maintained in the face of the defendant's competition. See also In re Application of New State Ice Co., *ibid.*, p. 748. Other formal orders of the Commission have been issued without opinion.

[38] 8th & 9th Ann. Rep. Okla. Corp. Comm., pp. 5, 6.

[39] Okla. Sess. Laws, 1917, c. 270.

[40] Okla. Sess. Laws, 1923, c. 113, § 4. This statute was held valid against objections under both the Federal and State Constitutions in *Ex parte Tindall*, 102 Okla. 192; 229 Pac. 125, and *Barbour* v. *Walker*, 126 Okla. 227, 229; 259 Pac. 552. See also *Chicago, R. I. & P. Ry. Co.* v. *State*, 123 Okla. 190; 252 Pac. 849; *Chicago, R. I. & P. Ry. Co.* v. *State*, 126 Okla. 48; 258 Pac. 874. As to certificates of public convenience and necessity for the operation of a cotton gin, see *Hohman* v. *State*, 122 Okla. 45; 250 Pac. 514.

posing to do business in any locality already possessing one such utility.[41]

*Fourth.* Can it be said in the light of these facts that it was not an appropriate exercise of legislative discretion to authorize the Commission to deny a license to enter the business in localities where necessity for another plant did not exist? The need of some remedy for the evil of destructive competition, where competition existed, had been and was widely felt. Where competition did not exist, the propriety of public regulation had been proven. Many communities were not supplied with ice at all. The particular remedy adopted was not enacted hastily. The statute was based upon a long-established state policy recognizing the public importance of the ice business, and upon 17 years' legislative and administrative experience in the regulation of it. The advisability of treating the ice business as a public utility and of applying to it the certificate of convenience and necessity had been under consideration for many years. Similar legislation had been enacted in Oklahoma under similar circumstances with respect to other public services. The measure bore a substantial relation to the evils found to exist. Under these circumstances, to hold the Act void as being unreasonable, would, in my opinion involve the exercise not of the function of judicial review, but the function of a super-legislature. If the Act is to be stricken down, it must be on the ground that the Federal Constitution guarantees to the individual the absolute right to enter the ice business, however detrimental the exercise of that right may be to the public welfare. Such, indeed, appears to be the contention made.

---

[41] Okla. Sess. Laws, 1925, c. 102, §§ 5, 6. Control over entry into these businesses, power and water plants, and the like, had theretofore been exercised by the requirement of a franchise from the municipality to be served. See *Pawhuska* v. *Pawhuska Oil & Gas Co.*, 28 Okla. 563, 568; 115 Pac. 353; *Huffaker* v. *Fairfax*, 115 Okla. 73; 242 Pac. 254. Cf. Okla. Const., art. IX, § 2, art. XVIII, § 5.

*Fifth.* The claim is that manufacturing ice for sale and distribution is a business inherently private, and, in effect, that no state of facts can justify denial of the right to engage in it. To supply one's self with water, electricity, gas, ice or any other article, is inherently a matter of private concern. So also may be the business of supplying the same articles to others for compensation. But the business of supplying to others, for compensation, any article or service whatsoever may become a matter of public concern. Whether it is, or is not, depends upon the conditions existing in the community affected.[42] If it is a matter of public concern, it may be regulated, whatever the business. The public's concern may be limited to a single feature of the business, so that the needed protection can be secured by a relatively slight degree of regulation. Such is the concern over possible incompetence, which dictates the licensing of dentists, *Dent* v. *West Virginia,* 129 U. S. 114, 122; *Douglas* v. *Noble,* 261 U. S. 165, 170; or the concern over possible dishonesty, which led to the licensing of auctioneers or hawkers, *Baccus* v. *Louisiana,* 232 U. S. 334, 338. On the other hand, the public's concern about a particular business may be so pervasive and varied as to require constant detailed supervision and a very high degree of regulation. Where this is true, it is common to speak of the business as being a " public " one, although it is privately owned. It is to such businesses that the designation " public utility " is commonly applied; or they are spoken of as " affected with a public interest." *German Alliance Ins. Co.* v. *Lewis,* 233 U. S. 389, 408.

A regulation valid for one kind of business may, of course, be invalid for another; since the reasonableness

---

[42] " Plainly circumstances may so change in time or so differ in space as to clothe with such an [public] interest what at other times or in other places would be a matter of purely private concern." *Block* v. *Hirsh,* 256 U. S. 135, 155.

of every regulation is dependent upon the relevant facts. But so far as concerns the power to regulate, there is no difference in essence, between a business called private and one called a public utility or said to be " affected with a public interest." Whatever the nature of the business, whatever the scope or character of the regulation applied, the source of the power invoked is the same. And likewise the constitutional limitation upon that power. The source is the police power. The limitation is that set by the due process clause, which, as construed, requires that the regulation shall be not unreasonable, arbitrary or capricious; and that the means of regulation selected shall have a real or substantial relation to the object sought to be obtained. The notion of a distinct category of business " affected with a public interest," employing property " devoted to a public use," rests upon historical error. The consequences which it is sought to draw from those phrases are belied by the meaning in which they were first used centuries ago,[43] and by the decision of this Court, in *Munn* v. *Illinois,* 94 U. S. 113, which first introduced them into the law of the Constitution.[44] In my opinion, the true principle is that the

[43] In Lord Hale's " Treatise on the Ports of the Sea," Hargrave, " Law Tracts," pp. 77–78. Lord Hale was speaking of the particulars, wharves and cranes in ports; and did not purport to generalize the obligation to serve all persons at reasonable rates in other circumstances. See Breck P. McAllister, " Lord Hale and Business Affected With a Public Interest," 43 Harv. L. Rev. 759. He was speaking of duties arising at common law, and not of limitations upon the legislative power of Parliament. See J. A. McClain, Jr., " The Convenience of the Public Interest Concept," 15 Minn. L. Rev. 546. He could not have been speaking of such limitations, for in England they did not exist; and Parliament was accustomed to regulate prices of commodities of all kinds. See note 46, *infra.*

[44] Chief Justice Waite, who wrote the opinion, said generally, p. 126, " Property does become clothed with a public interest when used in a manner to make it of public consequence, and affect the

State's power extends to every regulation of any business reasonably required and appropriate for the public protection. I find in the due process clause no other limitation upon the character or the scope of regulation permissible.

*Sixth.* It is urged specifically that manufacturing ice for sale and distribution is a common calling; and that the right to engage in a common calling is one of the fundamental liberties guaranteed by the due process clause. To think of the ice-manufacturing business as a common calling is difficult; so recent is it in origin and so peculiar in character. Moreover, the Constitution does not require that every calling which has been common shall ever remain so. The liberty to engage in a common calling, like other liberties, may be limited in the exercise of the police power. The slaughtering of cattle had been a common calling in New Orleans before the monopoly sustained in *Slaughter-House Cases,* 16 Wall. 36, was created by the legislature. Prior to the Eighteenth Amendment selling liquor was a common calling, but this Court held it to be consistent with the due process clause for a State to abolish the calling, *Bartemeyer* v. *Iowa,* 18 Wall. 129; *Mugler* v. *Kansas,* 123 U. S. 623, or to establish a system limiting the number of licenses, *Crowley* v. *Christensen,* 137 U. S. 86. Every citizen has the right to navigate a river or lake, and may even carry others thereon for hire. But the ferry privilege may be made exclusive in order that the patronage may be sufficient to justify maintaining the ferry service, *Conway* v. *Taylor's Executor,* 1 Black 603, 633, 634.

community at large," and referred with approval to statutes regulating the prices of bread and the rates of chimney-sweepers, as well as of persons in other callings still regulated. See Walton H. Hamilton, "Affectation [*sic*] with a Public Interest," 39 Yale L. J. 1089, 1095–1096. See also *German Alliance Ins. Co.* v. *Lewis,* 233 U. S. 389, 408.

It is settled that the police power commonly invoked in aid of health, safety and morals, extends equally to the promotion of the public welfare.[45] The cases just cited show that, while, ordinarily, free competition in the common callings has been encouraged, the public welfare may at other times demand that monopolies be created. Upon this principle is based our whole modern practice of public utility regulation. It is no objection to the validity of the statute here assailed that it fosters monopoly. That, indeed, is its design. The certificate of public convenience and invention is a device—a recent social-economic invention—through which the monopoly is kept under effective control by vesting in a commission the power to terminate it whenever that course is required in the public interest. To grant any monopoly to any person as a favor is forbidden even if terminable. But where, as here, there is reasonable ground for the legislative conclusion that in order to secure a necessary service at reasonable rates, it may be necessary to curtail the right to enter the calling, it is, in my opinion, consistent with the due process clause to do so, whatever the nature of the business. The existence of such power in the legislature seems indispensable in our ever-changing society.

It is settled by unanimous decisions of this Court, that the due process clause does not prevent a State or city from engaging in the business of supplying its inhabitants with articles in general use, when it is believed that they

---

[45] *Lake Shore & M. S. Ry. Co.* v. *Ohio,* 173 U. S. 285, 292; *Chicago & Alton R. Co.* v. *Tranbarger,* 238 U. S. 67, 77; *Chicago, B. & Q. R. Co.* v. *Drainage Commissioners,* 200 U. S. 561, 592; *Bacon* v. *Walker,* 204 U. S. 311, 317. "But it was recognized in the cases cited, as in many others, that freedom of contract is a qualified and not an absolute right. There is no absolute freedom to do as one wills or to contract as one chooses." *Chicago, B. & Q. R. Co.* v. *McGuire,* 219 U. S. 549, 567. Compare *Walls* v. *Midland Carbon Co.* 254 U. S. 300.

cannot be secured at reasonable prices from the private dealers. Thus, a city may, if the local law permits, buy and sell at retail coal and wood, *Jones* v. *Portland,* 245 U. S. 217; or gasoline, *Standard Oil Co.* v. *Lincoln,* 275 U. S. 504. And a State may, if permitted by its own Constitution, build and operate warehouses, elevators, packinghouses, flour mills or other factories, *Green* v. *Frazier,* 253 U. S. 233. As States may engage in a business, because it is a public purpose to assure to their inhabitants an adequate supply of necessary articles, may they not achieve this public purpose, as Oklahoma has done, by exercising the lesser power of preventing single individuals from wantonly engaging in the business and thereby making impossible a dependable private source of supply? As a State so entering upon a business may exert the taxing power all individual dealers may be driven from the calling by the unequal competition. If States are denied the power to prevent the harmful entry of a few individuals into a business, they may thus, in effect, close it altogether to private enterprise.

*Seventh.* The economic emergencies of the past were incidents of scarcity. In those days it was preëminently the common callings that were the subjects of regulation. The danger then threatening was excessive prices. To prevent what was deemed extortion, the English Parliament fixed the prices of commodities and of services from time to time during the four centuries preceding the Declaration of Independence.[46] Like legislation was en-

[46] " In Lord Hale's time . . . all activity comprehended under what we call business, was public, and all of it subject to price control." Walton H. Hamilton, "Affectation [sic] With a Public Interest," 39 Yale L. J. 1089, 1094. For voluminous collections of statutes and materials relating to Parliamentary control of business in England prior to the American Revolution, see the references in Edward A. Adler, "Business Jurisprudence," 28 Harv. L. Rev. 135; J. A. McClain, Jr., " The Convenience of the Public Interest Concept," 15

acted in the Colonies; and in the States, after the Revolution.[47] When the first due process clause was written into the Federal Constitution, the price of bread was being fixed by statute in at least two of the States, and this practice continued long thereafter.[48] Dwelling houses when occupied by the owner are preëminently private property. From the foundation of our Government those who wished to lease residential property had been free to charge to tenants such rentals as they pleased. But for years after the World War had ended, the scarcity of dwellings in the City of New York was such that the State's legislative power was invoked to ensure reasonable rentals. The constitutionality of the statute was sustained by this Court. *Marcus Brown Holding Co.* v. *Feldman,* 256 U. S. 170. Similar legislation of Congress for the City of Washington was also upheld. *Block* v. *Hirsh,* 256 U. S. 135.

*Eighth.* The people of the United States are now confronted with an emergency more serious than war. Misery is wide-spread, in a time, not of scarcity, but of over-abundance. The long-continued depression has brought unprecedented unemployment, a catastrophic fall in commodity prices and a volume of economic losses which threatens our financial institutions.[49] Some people

---

Minn. L. Rev. 546; Breck P. McAllister, "Lord Hale and Business Affected With a Public Interest," 43 Harv. L. Rev. 759, 767; Milton Handler, "The Constitutionality of Investigations by the Federal Trade Commission," 28 Col. L. Rev. 708, 712–714.

[47] Statutes of eight of the thirteen States passed during the Revolution, and fixing the price of almost every commodity in the market, are listed in 33 Harv. L. Rev. 838, 839.

[48] Maryland Laws of 1789, c. 8, § 2, Herty's Digest of the Laws of Maryland, 1799, p. 250; 5 Statutes of South Carolina 186, 1 South Carolina Acts of Assembly, 1791–1794, p. 88.

[49] See Hearings before the La Follette subcommittee of the Senate Committee on Manufactures, Seventy-second Congress, First Session,

believe that the existing conditions threaten even the stability of the capitalistic system.[50] Economists are searching for the causes of this disorder and are reëxamining the bases of our industrial structure. Business men are seeking possible remedies. Most of them realize that failure to distribute widely the profits of industry has been a prime cause of our present plight. But rightly or wrongly, many persons think that one of the major contributing causes has been unbridled competition.[51] Increasingly, doubt is expressed whether it is economically wise, or morally right, that men should be permitted to

---

on Senate Bill 6215 (71st Congress), to establish a National Economic Council, Parts 1 and 2 (October 22 to December 19, 1931), particularly the testimony of Dr. E. A. Goldenweiser, director of research and statistics of the Federal Reserve Board, of Mr. L. H. Sloan, vice-president of the Standard Statistics Company, and of Miss Frances Perkins, Industrial Commissioner of the State of New York, pp. 3–150; "When We Choose To Plan," Graphic Survey, March 1, 1932. See also Hearings on December 28, 1931–January 9, 1932, the La Follette-Costigan Bills, Senate Bills Nos. 174, 262, and 3045 (72d Congress).

[50] See Edward S. Corwin, "Social Planning under the Constitution," 26 American Political Science Review 1; W. B. Donham, "Business Adrift," (1931), p. 165; "America Faces the Future," edited by Charles A. Beard, (1932), pp. 1–10; Paul M. Mazur, "New Roads to Prosperity," (1931), c. V.

[51] W. B. Donham, "Business Adrift," pp. 141, 142; "The Swope Plan," edited by J. George Frederick, (1931), pp. 70, 73, 128; Richard T. Ely, "Hard Times, The Way In and the Way Out," (1931), pp. 62–64, 135, 137; "The Menace of Overproduction," edited by Scoville Hamlin, (1930); Dexter M. Keezer and Stacy May, "The Public Control of Business," (1930), p. 83; Walker D. Hines, "Planning in a Particular Industry," Bulletin of the Taylor Society, October, 1931; Philip Cabot, "The Vices of Free Competition," The Yale Review, Autumn, 1931; Julius H. Barnes, "Business Looks at Unemployment," Atlantic Monthly, August, 1931; "The Federal Anti-Trust Laws: A Symposium," edited by Milton Handler (December, 1931).

add to the producing facilities of an industry which is already suffering from over-capacity. In justification of that doubt, men point to the excess-capacity of our productive facilities resulting from their vast expansion without corresponding increase in the consumptive capacity of the people. They assert that through improved methods of manufacture, made possible by advances in science and invention and vast accumulation of capital, our industries had become capable of producing from thirty to one hundred per cent. more than was consumed even in days of vaunted prosperity; and that the present capacity will, for a long time, exceed the needs of business.[52] All agree that irregularity in employment—the greatest of our evils—cannot be overcome unless production and consumption are more nearly balanced. Many insist there must be some form of economic control. There are plans for proration. There are many proposals for stabilization.[53] And some thoughtful men

[52] The depression which began in 1929 has greatly reduced the present consumptive capacity; and the loss of export trade, and the arrest in the growth in population (resulting from the lessened birthrate and the practical stoppage of immigration), apparently preclude the rapid increase of consumptive capacity which followed the earlier periods of depression.

[53] See Charles A. Beard, "America Faces the Future," (1932), pp. 117–140; "The Swope Plan," edited by J. George Frederick (1931); Report No. 12 of the Committee on Continuity of Business and Employment of the United States Chamber of Commerce, October 2–3, 1931; Report of the Executive Council, American Federation of Labor to the 51st Annual Convention, October 5, 1931; Stuart Chase, "A Ten Year Plan for America," Harpers' Magazine, June, 1931; George Soule, "What Planning Might Do," New Republic, March 11, 1931; "When We Choose to Plan," Graphic Survey, March 1, 1932; "The New Challenge to Scientific Management," Bulletin of the Taylor Society, April, 1931; Robert J. McFall, "Planning Industry," id., June, 1931; Horace B. Drury, "The Hazard of Business," id., December, 1931; Grover A. Whalen, "National Planning," id., February,

of wide business experience insist that all projects for stabilization and proration must prove futile unless, in some way, the equivalent of the certificate of public convenience and necessity is made a prerequisite to embarking new capital in an industry in which the capacity already exceeds the production schedules.[54]

Whether that view is sound nobody knows. The objections to the proposal are obvious and grave. The remedy might bring evils worse than the present disease. The

---

1932; J. Russell Smith, " The End of An Epoch," Graphic Survey, July 1, 1931; Mary van Kleeck, " Planning and the World Paradox," id., November 1, 1931; Lewis L. Lorwin, " The Origins of Economic Planning," id., February 1, 1932; H. S. Person, " Scientific Management as a Philosophy and Technique of Progressive Industrial Stabilization," paper presented at World Social Economic Congress, August, 1931; " When Will America Begin to Plan? " Christian Century, March 11, 1931. See, generally, Hearings before the La Follette subcommittee, on S. 6215, supra, note 49. Compare Editorial Research Reports, Washington, D. C., August 1, August 8, December 3, 1931.

[54] See Charles R. Stevenson, " The Way Out," (1932), particularly pp. 27, 31, 33; Philip Cabot, " The Vices of Free Competition," The Yale Review, Autumn, 1931; J. A. Hobson, " The State as an Organ of Rationalization," Political Quarterly, January–March, 1931; and the discussions by Professor Beard and Messrs. Swope, Chase, Soule and Smith, supra, note 53. Concerning the bituminous coal business, see United States Coal Commission, Final Report 1925, Part I, pp. 268, 269; " Opening New Mines on the Public Domain: A Way of Order for Bituminous Coal," by Walter H. Hamilton and Helen R. Wright, pp. 35–37; " The Case of Bituminous Coal," by Walton H. Hamilton and Helen R. Wright, pp. 170–173; 263, 264; Willard E. Atkins, et al., " Economic Behavior," (1931), c. XXII; Senate Bill No. 2935, §§ 2, 8 (72d Congress), introduced by Senator Davis, and report of Hearings, U. S. Daily, March 15, 1932, p. 1. Concerning petroleum and gas, see Ralph H. Fuchs, " Legal Technique and National Control of the Petroleum Industry," 16 St. Louis L. Rev. 389; J. Howard Marshall and Norman L. Meyers, " Legal Planning of Petroleum Production," 41 Yale L. J. 33; Samuel H. Slichter, " Modern Economic Society," 861, 862.

obstacles to success seem insuperable.[55]   The economic and social sciences are largely uncharted seas.   We have been none too successful in the modest essays in economic control already entered upon.   The new proposal involves a vast extension of the area of control.   Merely to acquire the knowledge essential as a basis for the exercise of this multitude of judgments would be a formidable task; and each of the thousands of these judgments would call for some measure of prophecy.   Even more serious are the obstacles to success inherent in the demands which execution of the project would make upon human intelligence and upon the character of men.   Man is weak and his judgment is at best fallible.

Yet the advances in the exact sciences and the achievements in invention remind us that the seemingly impossible sometimes happens.   There are many men now living who were in the habit of using the age-old expression: " It is as impossible as flying."   The discoveries in physical science, the triumphs in invention, attest the value of the process of trial and error.   In large measure, these advances have been due to experimentation.   In those fields experimentation has, for two centuries, been not only free but encouraged.   Some people assert that our present plight is due, in part, to the limitations set

[55] Compare Sumner H. Slichter, " Modern Economic Society," (1931), pp. 872–888; Charles Whiting Baker, " Pathways Back to Prosperity," (1932), pp. 59–61; Samuel Crowther, "A Basis for Stability," (1932), pp. 3–17; J. Franklin Ebersole, " National Planning," Bulletin of the Taylor Society, August, 1931; Virgil Jordan, " Some Aspects of National Stabilization," Mechanical Engineering, January, 1932; " What Price Stability," The Annalist, October 9, 1931; Warren Bishop, " The Rain of Plans," The Nation's Business, October, 1931; Myron W. Watkins, " The Economic Philosophy of Anti-Trust Legislation," Annals of the American Academy of Political and Social Science, January, 1930; Albert W. Atwood, " The Craze for National Planning," Saturday Evening Post, March 19, 1932.

by courts upon experimentation in the fields of social and economic science; and to the discouragement to which proposals for betterment there have been subjected otherwise. There must be power in the States and the Nation to remould, through experimentation, our economic practices and institutions to meet changing social and economic needs. I cannot believe that the framers of the Fourteenth Amendment, or the States which ratified it, intended to deprive us of the power to correct the evils of technological unemployment and excess productive capacity which have attended progress in the useful arts.[56]

To stay experimentation in things social and economic is a grave responsibility. Denial of the right to experiment may be fraught with serious consequences to the Nation. · It is one of the happy incidents of the federal system that a single courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country. This Court has the power to prevent an experiment.[57] We may strike down the statute which embodies it on the ground that, in our opinion, the measure is arbitrary, capricious or unreasonable. We have power to do this, because the due process clause has been held by the Court applicable to matters of substantive law as well as to matters of procedure. But in the exercise of this high power, we must be ever on our guard, lest we erect our prejudices into legal principles. If we would guide by the light of reason, we must let our minds be bold.

MR. JUSTICE STONE joins in this opinion.

---

[56] Compare Charles Warren, " The New ·' Liberty ' under the Fourteenth Amendment," 39 Harv. L. Rev. 431.

[57] Compare Felix Frankfurter, " The Public and Its Government," pp. 49–51.