MANSFIELD, Justice
(dissenting).
I respectfully dissent. I believe the Iowa Constitution, like the United States Constitution, permits the government to require a prisoner as a condition of parole to agree to searches during his or her term of parole. Such searches should especially be upheld when, as here, they are under the control and with the authorization of the parole officer, and when reasonable suspicion exists that the parolee has committed a crime or violated his terms of parole. While I acknowledge that much of my disagreement relates to this court’s 2010 decision in State v. Ochoa, 792 N.W.2d 260 (Iowa 2010), I believe the present decision is legally flawed, even accepting Ochoa.
I. Facts.
The thirty-one-year-old defendant, Isaac Baldón, who had a substantial criminal history including first-degree theft, third-degree burglary, possession with intent to deliver a controlled substance, transportation of a firearm as a felon, and being a felon in possession of a firearm, was paroled on the latter three charges on November 3, 2008. In his parole agreement, he specifically agreed to several conditions, including:
I shall reside at the place designated in the attached Parole Release instructions and shall not change residence unless I receive approval from my supervising officer.
I will submit my person, property, place of residence, vehicle, personal effects to search at any time, with or without a search warrant, warrant of arrest or reasonable cause by any parole officer or law enforcement officer.
I shall abstain from the use, purchase, possession, or transfer of any drug unless prescribed for me by a physician, and shall submit to drug monitoring tests when directed by my supervising officer. I shall not associate with drug users or sellers while on parole and shall avoid places where drugs are sold.
Six months later, Bettendorf police were patrolling the Traveler Motel, “probably the single highest crime location that we have in our city. We check it every day several times a day and run across all manner of criminal activity at that location,” including drugs, prostitution, and weapons offenses. Typically, the police check the license plates of all cars parked at the motel.
Officer Tripp ran a license plate check and determined that a vehicle registered to Baldón was parked at the motel. He also determined that Baldón had prior driver’s license revocations and was on parole. Officer Tripp called in to headquarters and asked that Baldon’s parole officer be notified. When contacted, Bal-don’s parole officer, Officer Peterson, gave permission for Baldon’s hotel room and vehicle to be searched. Officer Peterson also said he would be coming to the motel.
*836 Officer Tripp went to the front desk of the motel and learned that Baldón was registered to a room at the motel. This was different from the authorized Davenport residence he had provided to his parole officer. After Officer Peterson arrived, Officer Tripp, Officer Peterson, and two other police officers went to Baldon’s room and knocked on the door. Receiving no answer, they knocked again a minute or so later. At this point, Officer Tripp announced they were police and that Baldón needed to open the door.
When Baldón opened the door in his underwear, Officer Peterson recognized him and said hello. A sixteen-year-old girl wearing only a T-shirt was sitting on the bed.[45] Her underwear was on the floor. One of the officers took her outside. Officer Tripp, Officer Peterson, and the fourth officer conducted a search of the room and found nothing illegal.
Officer Tripp asked Baldón for the keys to his car. Officer Tripp went outside, began searching the vehicle, and found a baggie of marijuana in the trunk area. He then went back to the motel room, informed Officer Peterson what he had found, and the two of them went back out to the vehicle and ultimately found five other smaller baggies of marijuana. After being Mirandized, Baldón admitted that he knew the marijuana was in the vehicle, he had received it as payment for a debt, and he anticipated that by breaking it up and selling it he would receive $800. Baldón was criminally charged, his motion to suppress was denied, and he was convicted of possession of marijuana with intent to deliver and failure to have a drug stamp. See Iowa Code § 124.401(l)(d); id. § 453B.3 (2009).
II. Parole Searches and Our Ochoa Decision.
In a 6-3 decision, the United States Supreme Court held in 2006 that a parolee could be searched by a police officer without a warrant or particularized suspicion based on a California law that requires every prisoner eligible for release on parole to “ ‘agree in writing to be subject to search or seizure by a parole officer or other peace officer at any time of the day or night, with or without a search warrant and with or without cause.’ ” Samson v. California, 547 U.S. 843, 846, 126 S.Ct. 2193, 2196, 165 L.Ed.2d 250, 255 (2006) (quoting CaLPenal Code § 3067(a) (West 2000)). The Court noted that parole “is an established variation on imprisonment of convicted criminals,” and that the state is usually “willing to extend parole only because it is able to condition it upon compliance with certain requirements.” Id. at 850, 126 S.Ct. at 2198, 165 L.Ed.2d at 258 (citation and internal quotation marks omitted). Parolees “have severely diminished expectations of privacy by virtue of their status alone.” Id. at 852, 126 S.Ct. at 2199, 165 L.Ed.2d at 259. The Court also observed that the state has an “overwhelming interest” in supervising parolees because they are more likely to commit future criminal offenses. Id. at 853, 126 S.Ct. at 2200, 165 L.Ed.2d at 260 (citation and internal quotation marks omitted).
In Ochoa, a parole search case, we departed from Samson and decided that the search and seizure clause of Iowa’s Constitution provides more protection to parolees than the virtually identical Search and Seizure Clause of the United States Constitution. See 792 N.W.2d at 287-90. We thus held that the Iowa Constitution prohibited warrantless, suspicionless searches of parolees. We did not claim that this out *837 come was required by anything particular in the Iowa Constitution or any specific precedent under that constitution. Rather, the heart of the decision was a philosophical disagreement with the Samson holding, and we explained that we found the three-justice dissent more compelling than the six-justice majority. Id. at 282-83, 286-91.
I have serious concerns about an approach that treats a United States Supreme Court decision as just another dish on the menu. See id. at 267 (“The degree to which we follow United States Supreme Court precedent, or any other precedent, depends solely upon its ability to persuade us with the reasoning of the decision.”). The decisions of that Court are rendered by nine legal scholars of exceptional distinction. They come only after each case has been the subject of extensive adversarial briefing, argument, and attention. By contrast, this court composed its thirty-page state constitutional opinion in Ochoa without the benefit of any argument other than federal constitutional argument. See State v. Ochoa, No. 08-0412, 765 N.W.2d 607, 2009 WL 398390, at *2 n. 1 (Iowa Ct.App.2009) (noting that Ochoa “has not asserted that the state constitutional provision should be interpreted differently than the Fourth Amendment”). Simply stated, if we believe in an adversary system, the adversarial process before the United States Supreme Court is far more robust. That is especially true when, as in Ochoa, we venture into state constitutional issues that no one has briefed.[46]
I believe we went too far in Ochoa. We abandoned longstanding precedent without admitting we were doing so. We read too much into the text and history of the Iowa Constitution. And, even assuming it was appropriate to treat Samson as just another option, our simplistic “home trumps parolee status” approach was too dismissive of the grounds on which Samson was decided.
The first error committed by the court in Ochoa was to discard a long line of Iowa Supreme Court cases, many of them rather recent, giving deference to federal interpretations of the Fourth Amendment.
Because the search and seizure clause of the Iowa Constitution is nearly verbatim to the language of the Fourth Amendment, cases interpreting the Fourth Amendment are persuasive — but not binding — on our interpretation of the Iowa Constitution. We usually interpret the scope and purpose of the Iowa Constitution’s search and seizure provisions to track with federal interpretations of the Fourth Amendment.
State v. Christopher, 757 N.W.2d 247, 249 (Iowa 2008) (citation omitted). “The scope and purpose of Iowa’s search and seizure clause is coextensive with the federal court’s interpretation of the Fourth Amendment.” State v. Carter, 733 N.W.2d 333, 337 (Iowa 2007). “The Iowa Supreme Court generally interprets article I, section 8 of the Iowa Constitution to track federal interpretations of the Fourth Amendment.” Atwood v. Vilsack, 725 N.W.2d 641, 650 (Iowa 2006). “Cases interpreting the federal constitution are persuasive in our interpretation of the state constitution because the federal and state search-and-seizure clauses are similar.” State v. Hoskins, 711 N.W.2d 720, 725 (Iowa 2006).
Because the federal and state search- and-seizure clauses are nearly identical, federal cases interpreting the federal *838 provision are persuasive in our interpretation of the state provision. However, such cases are not binding on this court regarding our interpretation of the state provision.
State v. Carter, 696 N.W.2d 31, 37 (Iowa 2005) (citation and internal quotation marks omitted).
The Iowa Constitution also contains a search and seizure clause that is virtually identical to the Fourth Amendment. Accordingly, we usually interpret the scope and purpose of article I, section 8, of the Iowa Constitution to track with federal interpretations of the Fourth Amendment.
State v. Jones, 666 N.W.2d 142, 145 (Iowa 2003) (citations and internal quotation marks omitted).
Despite the length of the court’s opinion, Ochoa did not mention any of these recent statements.[47] Instead, it made the following assertion: “This court has to date generally developed a body of independent state constitutional law in the search and seizure area slowly and cautiously.” Ochoa, 792 N.W.2d at 265.
That is overstating things a bit. Actually, a careful reading of Ochoa would reveal exactly one cited case where we had diverged from federal interpretation of the Fourth Amendment in our interpretation of article I, section 8. See State v. Cline, 617 N.W.2d 277 (Iowa 2000), abrogated on other grounds by State v. Turner, 630 N.W.2d 601, 606 n. 2 (Iowa 2001). In Cline, this court declined to follow United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), which recognized a good faith exception to the application of the exclusionary rule. See 617 N.W.2d at 285-93.
Several points about Cline should be noted. First, the case was about remedy, not right. We did not say the Iowa Constitution would invalidate a search that the United States Constitution permits. In fact, we applied both federal and Iowa precedent in finding the underlying search unconstitutional, stating,
Because the language of article I, section 8 of the Iowa Constitution is nearly identical to the Fourth Amendment, the two provisions are generally deemed to be identical in scope, import, and purpose. Therefore, although our discussion of probable cause will focus on the Fourth Amendment, our analysis of this issue is equally applicable to the defendant’s claim under the Iowa Constitution.
Id. at 281-82 (citation and internal quotation marks omitted). Cline simply held that Iowa’s courts, as a matter of remedy, would not allow the use of evidence that had been unconstitutionally obtained.
Second, even on the question of remedy, we continued to sound a note of deference. Thus, concerning the exclusionary rule, we said, “In accordance with these general principles, we strive to be consistent with federal constitutional law in our interpretation of the Iowa Constitution, but we jealously guard our right and duty to differ in appropriate cases.” Id. at 285 (citation and internal quotation marks omitted).
Third, in deviating from federal precedent concerning the exclusionary rule, we followed an approach that, according to our research, most states addressing the issue had taken under their own state constitutions. See id. at 293 n. 3.
*839 None of these observations applies to Ochoa,. Contrary to Cline and a host of prior and (as noted) subsequent decisions, we abandoned in Ochoa all deference to federal interpretation of the Fourth Amendment. We claimed that we did so “to resolve any inconsistency in our prior cases.” Ochoa, 792 N.W.2d at 267. That assertion was incorrect. There was no prior inconsistency on the question whether United States Supreme Court interpretations of the Fourth Amendment were entitled to deference in interpreting the nearly identical wording of article I, section 8. We simply decided to go in a different direction.[48]
Having set aside what went before, this court in Ochoa then embarked on a brief textual analysis of article I, section 8. We observed that in article I, section 8, the reasonableness clause and the warrant clause are separated by a semicolon, whereas in the Fourth Amendment they are separated by a comma. Id. at 268-69. Citing a famous monograph on style, the court indicated that “a semicolon is used to emphasize the relationship between the two clauses of the sentence.” Id. Thus, the court suggested (although it fell short of saying) that in Iowa’s Constitution, there might be a closer connection between the two clauses. This strikes me as taking the grammarian out of context. As compared to a period, a semicolon might suggest a greater connection, but compared to a comma? Indeed, the cited grammarian makes this very point. See William Strunk, Jr. & E.B. White, The Elements of Style 6 (4th ed. 2000) (stating that a semicolon “suggests the close relationship between the two statements in a way that the [version consisting of two sentences separated by a period] does not attempt, and better then the [version consisting of two clauses separated by a comma and a conjunction] because it is briefer and therefore more forcible”). There are, it is worth noting, several other non-substantive variations between the two documents. For instance, the Iowa Constitution reorders the words “searches and seizures” to read “seizures and searches” and replaces “Warrants” with “warrant.” I would not extract a substantive meaning out of these cosmetic differences.
Ochoa ⅛ textual discussion was then followed by a bibliographical historical discussion of the Fourth Amendment. Ochoa, 792 N.W.2d at 269-72. Yet the *840 opinion itself concluded that the eighteenth century historical record was of limited usefulness in addressing parole systems that were not introduced until the late nineteenth century. Id. at 272.
Turning then to the Iowa historical record, the Ochoa opinion found that it “tends to shed light on the value the Iowa framers placed on article I, section 8.” Id. at 274. I think the basis for drawing this conclusion is exceedingly thin. Ochoa quoted a statement from one of our framers of our present 1857 Constitution. Id. (quoting Mr. Ells). The point he was making, however, had nothing to do with article I, section 8. He was explaining, rather, why his committee was proposing additional enumerated rights that, unlike article I, section 8, had not been part of the previous constitution. 1 The Debates of the Constitutional Convention of the State of Iowa 100 (W. Blair Lord rep., 1857), available at http://www.statelibraryofíowa. org'services/collectionsAaw-library/iaconst.
In addition, Ochoa quoted a statement from a framer of the 1844 Constitution. According to Ochoa, this framer “deemed the most important right was ‘to secure to the poor man a little spot of ground where he could build him a cottage and have a home for himself and family, free from the fear of being turned out of doors.’ ” See 792 N.W.2d at 275 (quoting Mr. Lucas). However, this statement also had nothing to do with search and seizure. Rather, it related to a proposed homestead amendment, providing that “[e]very person residing in the State to have the right to hold 80 acres of land, with the improvements, or a house,” which did not make it into the 1844 (or the 1857) Constitution. See Fragments of the Debates of the Iowa Constitutional Conventions of 1811 and 1816, at 159 (Benjamin F. Shambaugh ed., 1900), available at http://www.statelibraryofíowa. org/services/collections/law-library/iaconst.
Ochoa added that “the drafters of the Iowa Constitution placed the Iowa Bill of Rights at the beginning of the constitution, for apparent emphasis.” 792 N.W.2d at 274. No citation is provided for the “apparent emphasis” claim. I think it is difficult to draw any inference from the ordering of provisions within our constitution. The 1844 and the 1846 constitutions also began with a bill of rights. Article I, section 5 of the 1857 Constitution (repealed in 1992) provided that someone who had engaged in dueling would be disqualified from holding public office. Does this mean our framers thought article I, section 5 was more important than article I, section 8?
Ochoa also discussed briefly other states’ constitutional precedents on parole searches. 792 N.W.2d at 288-84. It indicated that courts were divided before Samson on the constitutionality of suspi-cionless parole searches and noted that since Samson, two state supreme courts had “declined to depart from Samson in interpreting their state constitutions.” Id. at 284.
With the benefit of more than two years’ additional experience, it so far appears that this court stands alone in its flat-out rejection of Samson. See In re Miranda, 289 P.3d 957, 961 (Colo.2012) (citing Samson and stating that in Colorado, “parole officers may search parolees’ persons, residences, or vehicles unannounced, without a warrant, and without reasonable suspicion”); State v. Cruz, 144 Idaho 906, 174 P.3d 876, 881 (Idaho Ct.App.2007) (declining to hold that the Idaho Constitution provides more protection than Samson and noting that Idaho has provided greater protections “based on the uniqueness of our state, our Constitution, and our longstanding jurisprudence,” but “[n]one of these factors support a divergence from the interpretation of the Fourth Amend *841 ment by the United States Supreme Court in this case”); State v. Bartylla, 755 N.W.2d 8, 18-19 (Minn.2008) (applying-Samson under the Minnesota Constitution and stating that “we do not believe that the Samson approach reflects a retrenchment on the Bill of Rights”); State v. Turner, 297 S.W.3d 155, 166 (Tenn.2009) (“A parole condition requiring that the parolee submit to warrantless searches is reasonable in light of the parolee’s significantly diminished privacy interests; the goals sought to be attained by early release; and society’s legitimate interest in protecting itself against recidivism. We therefore adopt the reasoning of Samson and hold that the Tennessee Constitution permits a parolee to be searched without any reasonable or individualized suspicion where the parolee has agreed to warrant-less searches by law enforcement officers.”). In fact, the only out-of-state reported opinion to have cited Ochoa is a single judge’s dissent. See State v. Johnson, 813 N.W.2d 1, 18 (Minn.2012) (Meyer, J., dissenting). This should give us pause.
In addition, Ochoa discussed State v. Cullison, 173 N.W.2d 533 (Iowa 1970). See Ochoa, 792 N.W.2d at 285-86. But Ochoa recognized that Cullison was a Fourth Amendment decision. As described by the Ochoa court, Cullison “held that a parolee is afforded the same rights as any other person under the Fourth Amendment.” Id. at 286. That was a correct characterization. The case makes no reference at all to article I, section 8 of the Iowa Constitution. The issue was whether a parolee by virtue of his or her status loses Fourth Amendment protection. Cullison applied mostly federal and out-of-state authority to conclude that “an Iowa State parolee’s Fourth Amendment rights, privileges and immunities, [should] be accorded the same recognition as any other person.” 173 N.W.2d at 536-37. As a Fourth Amendment decision, Cullison has been superseded by more recent United States Supreme Court authority. We did not suggest in Ochoa that Cullison was in any way a controlling precedent.[49]
Thus, Ochoa really came down to a disagreement with Samson. And there was not that much to say. Taking issue with the Samson majority, Ochoa concluded, “[T]he fact that a parolee is released into the larger community is the overriding factor for purposes of search and seizure analysis.” 792 N.W.2d at 291. In short, Ochoa squarely rejected the Samson view that parole is a “variation on imprisonment,” see Samson, 547 U.S. at 850, 126 S.Ct. at 2198, 165 L.Ed.2d at 258, and instead found dispositive the parolee’s physical location outside of prison. Thus, the general authority that the state unquestionably has to conduct searches inside prison could not be applied, in the Ochoa court’s view, once the prisoner had left prison on parole.[50]
I disagree with that underlying philosophical view. Consider this question: If the “sanctity of the home” trumps an offender’s status, as we held in Ochoa, why has this court repeatedly upheld sex offender residency restrictions? See, e.g., Formaro v. Polk County, 773 N.W.2d 834 (Iowa 2009); State v. Seering, 701 N.W.2d 655 (Iowa 2005). These restrictions, which *842 apply even after parole, severely limit where certain sex offenders can live. Most people would regard them as a more serious intrusion on “sanctuary, comfort, seclusion, security, and identity” than the search provision at issue in Ochoa. See Ochoa, 192 N.W.2d at 289. I recognize that we are talking about different constitutional provisions. But if we are going to engage in value-driven analysis, as we did in Ochoa, why has status won out in one area but not the other?
As a result of Ochoa and its elimination of deference to federal interpretation of the Fourth Amendment, we now have two different sets of search and seizure rules in Iowa. If Ochoa or Baldón had been prosecuted for violating federal drug laws based on the incidents in question, notwithstanding the fact that the underlying search was conducted by state officials, the established Fourth Amendment law would have applied. See United, States v. Bach, 310 F.3d 1068, 1066 (8th Cir.2002) (“[Federal courts in a federal prosecution do not suppress evidence that is seized by state officers in violation of state law, so long as the search complied with the Fourth Amendment.”). Thus, any motion to suppress would have been denied, and the denial would have been upheld on appeal. However, because they were prosecuted in state court, our rather unclear work-in-progress version of search and seizure jurisprudence under article I, section 8 applies.
The United States Supreme Court’s interpretation of the Fourth Amendment has been comparatively stable. See Davis v. United States, — U.S. -, -, 131 S.Ct. 2419, 2433, 180 L.Ed.2d 285, 301 (2011) (“Decisions overruling this Court’s Fourth Amendment precedents are rare.”). And there are decisions from many other appellate courts available to fill in gaps left by that Court. Unfortunately, Iowa officials can no longer rely on the very substantial body of law interpreting the Fourth Amendment and must instead engage in guesswork as to what this court will do next. I do not believe this disparity and uncertainty serve the public interest.
The concurrence offers two divergent reasons for not deferring to United States Supreme Court jurisprudence in this area. At one point, my colleague says that the Court’s Fourth Amendment decisions display “a striking lack of stable consensus” and are marked by “incoherence.” Later, my colleague maintains that the Court has “proceeded to steadily reduce the scope of constitutional protections” and has “a tendency to dilute the substantive protections.” One cannot have it both ways. Either the Court (in the view of the concurrence) is being inconsistent and unpredictable in its rulings, or it is on a consistent march to limit Fourth Amendment rights — unless one believes that ruling in favor of the government is itself a sign of incoherence. The concurrence states, “Law enforcement officials need not learn two different standards; they need only learn one, namely, whatever standard is most restrictive.” But what is the Iowa standard? We have three cases — Ochoa, State v. Pals, 805 N.W.2d 767 (Iowa 2011), and now Baldón. I doubt even my colleagues would claim that this handful of decisions provide any meaningful guidance. They make it clear that what the United States Supreme Court has approved is not good enough, but without explaining what would be good enough.
The concurrence implies that more restrictions against “arbitrary exercise of government power” are on their way from this court. Therefore, according to the concurrence, “when in doubt, get a warrant.” If this is the court’s search and seizure jurisprudence, it is so generalized *843 as to be meaningless. Obviously, there are some circumstances when all members of this court would vote to uphold a war-rantless search.
The concurrence also makes the point that “a state in the federalist system amounts to a ‘laboratory1 of democracy.” But when we substitute our judgment for that of Iowa’s elected government on when a parolee may be searched, we are not being democratic. Rather, we are overturning the decision of the people’s representatives.[51] It is noteworthy that a number of states have chosen to limit parole searches as a matter of law or regulation. See, e.g., State v. Coleman, 292 Kan. 813, 257 P.3d 320, 327 (2011) (noting that “[w]hile the Samson Court found that California parole conditions allowed the police to conduct suspicionless searches of parolees, the Kansas Legislature and the Parole Board elected to place restrictions on parolee searches”); State v. Benavidez, 148 N.M. 190, 231 P.3d 1132, 1137 (N.M.Ct. App.2010) (requiring reasonable suspicion for a warrantless parolee search based on state regulation, not the state constitution); State v. Rowan, 341 Wis.2d 281, 814 N.W.2d 854, 861 (2012) (rejecting a federal and state constitutional challenge to a parole condition authorizing suspicionless searches that was imposed based on a court’s individualized determination pursuant to Wisconsin law).
The issue is not whether we have the authority to independently interpret our own constitution. Clearly we do. Nor is the issue whether we are the final arbiters of the meaning of that constitution. Clearly we are. The issue is whether this substantial authority should be exercised in the search and seizure area with a degree of self-imposed modesty and restraint. That was the approach taken by this court until three years ago. I think it was a good one.
III. The Consent Issue.
Be that as it may, we did leave open several questions in Ochoa. For one thing, the search in that case was conducted by the police without the involvement of a parole officer. Ochoa, 792 N.W.2d at 262. And there was no particularized suspicion of criminal activity or a parole violation. Id. at 263. In addition to leaving open those matters, id. at 291, we also did not decide whether the parolee could be bound by an agreement consenting in advance to such a search. Id. This case presents all of those circumstances. However, my colleagues choose only to address one of them — the enforceability of a consent.
My colleagues could have decided the consent question by applying the well-developed body of federal constitutional law starting with Schneckloth v. Bustamonte. See 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); see also Samson, 547 U.S. at 852 n. 3, 126 S.Ct. at 2199 n. 3, 165 L.Ed.2d at 259 n. 3 (leaving this question *844 undecided). This might have led them to the same result. Unfortunately, rather than follow the well-established Schneck-loth road, my colleagues have decided to bushwhack their own path under the Iowa Constitution. Thus, while they initially discuss Schneckloth, they then veer away from it and opt for a “practical” approach based on “contract law.” Under this approach, the consent is deemed invalid because the prisoner has no “bargaining power”: The prisoner’s only choices are (1) to remain in prison and be subject to suspicionless searches or (2) to agree to be subject to suspicionless searches as a condition of leaving prison.
This syllogism sounds good if you say it quickly, but I think it falls apart on further analysis. If the prisoner is waiving a light that he or she did not have before entering into the agreement, that should be more of a reason to honor the waiver.
Parole is a privilege. “There is no constitutional or inherent right to be conditionally released from prison prior to the expiration of a valid sentence.” State v. Cronkhite, 613 N.W.2d 664, 667 (Iowa 2000). Thus, as a matter of fair bargaining and contract law, I do not understand why it is unfair for the state to insist upon the continued ability to conduct searches as part of the bargain. Indeed, by the majority’s logic, virtually all the conditions of the parole agreement should be unenforceable, because these are all things the defendant cannot do while in prison (e.g., “I shall not change residence unless I receive approval,” “I shall not associate with drug users,” etc.).[52]
The Iowa Department of Corrections requires each inmate to sign a parole agreement before being paroled. Iowa Admin. Code r. 201-45.1(2) (“The parolee may not be released on parole prior to the execution of the parole agreement.”). It is undisputed that the parole officer reviewed Baldon’s parole agreement with him before he signed it. We should be encouraging the use of these parole agreements, not discouraging them. Contracts where a convicted felon such as Baldón agrees in writing to certain rules and expectations are an important part of the rehabilitative process.
In short, the majority’s contract-based analysis is backward: It would be more appropriate to invalidate the contract if the state used the benefits of parole to extract a concession that the prisoner did not otherwise have to give. By the same token, like the Samson majority, I find it easier to uphold a warrantless search of a parolee than a probationer because parole is more akin to imprisonment than probation is to imprisonment and because a parolee is coming from prison. See 547 U.S. at 850, 126 S.Ct. at 2198, 165 L.Ed.2d at 258. My colleagues’ reasoning is on the wrong track here as well.
One could argue that the right to be free from warrantless, suspicionless searches and seizures in the outside world is so important that it cannot be waived in advance, even by prisoners. At times, the majority hints at that approach, saying, “As a mandatory term of parole, such consent would also have the effect of justifying the search on the basis of parole status. This is not permitted under Ochoa.” The majority also refers to giving article I, *845 section 8 its “integrity,” a somewhat amorphous concept that seems to suggest the right is not waivable. I would not agree with that view, but at least it would be a logical way to defend the result reached by the majority in this case. The majority’s wholesale rejection of parole agreements and misapplication of contract law, however, leave me baffled.
Most states to have confronted the question have upheld the validity of parole agreements in which the parolee consents in advance to warrantless searches. See McFerrin v. State, 344 Ark. 671, 42 S.W.3d 529, 534-35 (2001) (“[W]e have held that a parolee’s advance consent is valid because the parolee remains in the custody of the penal institution from which he is released .... ”); State v. Devore, 134 Idaho 344, 2 P.3d 153, 156 (Idaho Ct.App.2000) (“The ‘reasonable grounds’ requirement for warrantless searches by probation or parole officers does not apply when the subject of the search has entered into a probation or parole agreement that includes a consent to warrantless searches.”); People v. Wilson, 228 Ill.2d 35, 319 Ill.Dec. 353, 885 N.E.2d 1033, 1042 (2008) (upholding an agreement where the parolee consents in advance to warrantless searches); Sullivan v. Bunting, 133 Ohio St.3d 81, 975 N.E.2d 999, 1001 (2012) (per curiam) (upholding the search of a parolee’s email based on his prior consent to warrantless searches); see also Roman v. State, 570 P.2d 1235, 1241-42 (Alaska 1977) (“Depending on the nature of the crime involved, a condition of release granting authorities the right to search premises and persons at reasonable times could stand muster under both the Alaska and federal Constitutions.”); William E. Ringel, Searches and Seizures, Arrests and Confessions § 17:8 (2012) (“In most jurisdictions, one of the conditions in [parole] agreements is that the parolee or probationer consents to the search of himself, his possessions, and his residence by a parole officer, and a majority of courts give effect to such provisions.”).
The consent to search in the standard IDOC parole agreement is broad and authorizes searches “without ... reasonable cause” and by any “law enforcement officer.” In some states, this permission has been judicially narrowed. See State v. Heaton, 812 N.W.2d 904, 906, 909 (Minn.Ct.App.2012) (holding a parole agreement provision that “[t]he offender will submit at any time to an unannounced visit and/or search of the offender’s person, vehicle or premises by the agent/designee” justifies a search so long as reasonable suspicion exists); Commonwealth v. Hughes, 575 Pa. 447, 836 A.2d 893, 899 (2003) (finding that a search pursuant to a parole agreement is permissible when “(1) the parole officer had reasonable suspicion to believe that the parolee committed a parole violation; and (2) the search was reasonably related to the duty of the parole officer”); State v. Velasquez, 672 P.2d 1254, 1260 (Utah 1983) (holding that notwithstanding an agreement, the state still must have reasonable grounds for investigating whether a parolee has violated the terms of parole or committed a crime); Pena v. State, 792 P.2d 1352, 1356-58 (Wyo.1990) (adopting Utah’s approach).
If that approach were followed here, the search would still be upheld. Baldón was violating the terms of his parole by staying at the Traveler Motel, a known hotbed of drug and weapons violations. Yet the majority’s sweeping approach does not allow for this outcome, either. Although the majority purports to apply contract law, it disregards the tenet that when a contract is unconscionable, the court may simply “limit the application of any unconscionable term as to avoid any unconscionable result.” Restatement (Second) of Contracts § 208, at 107 (1981).
*846 The majority’s approach, I fear, will discourage the granting of parole to inmates who deserve it. Corrections officials need to be confident that they can detect and deter recidivism. The majority’s rule raises the costs of detecting and deterring recidivism by telling the State if it releases a convicted drug dealer, it may not be able to do a parole check on that dealer if he chooses to stay at a motel that is a drug haven instead of being at the residence where he is supposed to be.[53]
Also, parole agreements — like other agreements — have the advantage of predictability. The majority’s approach, by contrast, turns law enforcement into legal guesswork. In this case and Pals, my colleagues have made it clear that Iowa will not follow the established federal constitutional standards for when a consent to search is voluntary. But they have failed to articulate a coherent theory of volun-tariness to replace it.[54]
Pals involved a brief and amicable encounter between a police officer and an individual whom he had pulled over for having a dog at large. Both the majority and the dissent on the court of appeals agreed that the consent to search of the vehicle was voluntarily given. See State v. Pals, No. 09-0064, 780 N.W.2d 248, 2010 WL 447322, at *5 (Iowa Ct.App. Feb. 10, 2010) (majority opinion) (stating that “the circumstances as a whole leave no doubt that his consent was voluntary”); id. at *8 (Doyle, J., dissenting) (“I agree that ... Wubben’s request for consent to search the truck was completely devoid of any coercion, undue pressure, or threats, and that Pals’s consent was voluntary”). Yet this court reversed on the voluntariness of the consent, emphasizing a variety of procedural circumstances, including the fact that the individual had not been given specific advice that he could refuse to consent. Pals, 805 N.W.2d at 782-83.
Here the court can hardly fault the procedures under which consent was given — a written agreement was reviewed with Bal-dón before he signed it. So it focuses on “disproportionate bargaining power,” because if the prisoner does not sign the agreement, he or she has to remain in prison. Thus, the court purports to apply an unconscionability analysis derived from contract law. But if we consider my colleagues’ reasoning, it would seem to invalidate as involuntary many plea bargains. Doesn’t the State have the same “disproportionate bargaining power” when it has caught a criminal red-handed and offers him or her the opportunity to avoid many years in prison through a plea bargain?
Again, I could understand (although I would disagree with) the notion that the right to be free from suspicionless searches of a home, motel, or car is so important that it cannot be waived in advance by a prisoner. Arguably, Ochoa foreshadowed such a result. A straightforward Schneckloth analysis might also support the majority’s conclusion. But the majority’s ill-conceived venture into contract law, I fear, will only lead to more uncertainty and undesirable consequences in other areas of criminal law.
*847 IV. The Specifics of This Case.
Even if one were inclined to invalidate some warrantless searches of parolees, this would not be the case to do so. Baldon’s parole officer was present and both authorized and supervised the search. Moreover, at the time the search of Bal-don’s car occurred, it was already known that he was in violation of his parole agreement. Indeed, he was staying at a motel (that prohibited minors) with a school-age girl. In short, as I have already noted, this case presents two additional justifications for a parole search — the presence of the parole officer and the existence of reasonable suspicion or at least a clear parole violation. See United States v. Knights, 534 U.S. 112, 122, 122 S.Ct. 587, 593, 151 L.Ed.2d 497, 507 (2001) (holding unanimously that a warrantless search of a probationer’s apartment that was supported by reasonable suspicion and authorized as a condition of his probation was reasonable within the meaning of the Fourth Amendment); Griffin v. Wisconsin, 483 U.S. 868, 880, 107 S.Ct. 3164, 3172, 97 L.Ed.2d 709, 721-22 (1987) (holding that the special needs of Wisconsin’s probation system justified a warrantless search of a probationer by probation officers pursuant to a Wisconsin regulation that allowed probation searches based on reasonable grounds).
Unfortunately, the majority plays a bit of gotcha, finding that the State has waived any basis other than consent for upholding the search. This strikes me as unfair to the State. When this case was heard in the district court, we had not decided Ochoa. Baldon’s motion to suppress argued the parole agreement was unenforceable under both the United States and Iowa Constitutions, but Baldón did not urge a separate interpretation of the search and seizure clause in the Iowa Constitution. Not surprisingly, the trial court denied Baldon’s motion to suppress on the authority of Samson and the court of appeals decision in Ochoa (which had relied on Samson to uphold the parole search). Given the defendant’s failure to advance a separate state constitutional argument against the enforceability of the consent, and Samson’s status as a binding interpretation of federal constitutional law, the State presumably believed that it did not need to make a separate “reasonableness” or “special needs” argument below.
Now our Ochoa decision and today’s decisions have changed the landscape. Baldón is being granted relief under a separate state constitutional argument he never made below. Yet we deny to the State the opportunity ■ to go back to the district court and try to defend the search under our remade case law. Why?
It should be noted that Baldón himself does not object to our considering whether the search of the car was justified based on the presence of the parole officer or the existence of individualized suspicion. To the contrary, he briefed those issues in his opening brief. He logically, and I believe correctly, assumed those issues were still in play.
For the foregoing reasons, I respectfully dissent.
WATERMAN, J., joins this dissent.

. Minors are not allowed at the Traveler Motel. The girl was cited for being a minor in possession of tobacco and released to a guardian.

. Here, as in Ochoa, the court’s opinion is self-generated. It is not based on matters the appellant has briefed on appeal. Baldon's brief does not even address the consent issue. He maintains, rather, that we decided that question in Ochoa and that Ochoa controls this case. See Appellant’s Br. at 10-11.

. Ochoa cites a few cases with similar language, but the last one is from 1988. See Ochoa, 792 N.W.2d at 266 (citing State v. Showalter, 427 N.W.2d 166, 168 (Iowa 1988)). Ochoa would thus have the reader believe that only "older cases” embraced such an approach. Id. That is simply not true.

. Seeking to patch this hole in Ochoa, the majority now cites State v. Tonn, 195 Iowa 94, 104-07, 191 N.W. 530, 535-36 (1923), a case where this court decided that the exclusionary rule does not apply in Iowa and thus found that article I, section 8 should provide less protection than the Fourth Amendment. Tonn, like Cline, was a case about remedy, not about the scope of the right. Tonn has not been the law since 1961, when the United States Supreme Court held that the Fourteenth Amendment requires the federal exclusionary rule to apply to the states. See Mapp v. Ohio, 367 U.S. 643, 655-57, 81 S.Ct. 1684, 1691-92, 6 L.Ed.2d 1081, 1090-91 (1961).
Tonn was not cited in Ochoa, perhaps because it did not fit the narrative of Iowa historically having given "considerable solicitude to the sanctity of the home.” See Ochoa, 792 N.W.2d at 284. But see Tonn, 195 Iowa at 101-02, 191 N.W. at 532-33 (upholding a warrantless search where the county attorney simply went to the hotel where defendant was staying and, without his knowledge, retrieved his suitcase and handbag).
Tonn justified its deviation from the federal exclusionary rule partly on the ground that "the overwhelming weight of authority in the state courts” already had decided not to follow that rule. 195 Iowa at 106, 191 N.W. at 534.
I agree that Tonn is one other case where this court declined to follow Federal Fourth Amendment interpretation. But it is truly a stretch to link Tonn and Ochoa, as if two disconnected opinions nearly one hundred years apart represent a consistent and unbroken line of authority.

. Cullison cited article II, section 5 of our constitution for the proposition that a convicted felon on parole loses the right to vote or hold public office. 173 N.W.2d at 537. However, its conclusion that he or she retains all other rights, including Fourth Amendment rights, was not based on anything in the Iowa Constitution. Id.

. We also cited "academic commentaiy” that was critical of Samson, the specific examples being one treatise and a "raft of student notes.” Ochoa, 792 N.W.2d at 286-87.

. The concurrence’s invocation of Justice Brandeis's famous phrase is a bad fit. When Justice Brandéis used that phrase, he was dissenting from his colleagues’ decision to strike down an Oklahoma law on constitutional grounds. He wrote, "It is one of the happy incidents of the federal system that a single courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country.” New State Ice Co. v. Liebmann, 285 U.S. 262, 311, 52 S.Ct. 371, 386-87, 76 L.Ed. 747, 771 (1932) (Brandéis, J., dissenting) (emphasis added). The problem with lab experiments performed by the judiciary is that the citizens have not chosen them. And if they do not work out, it is difficult to pull the plug on them. This does not mean that Iowa judges should hesitate to follow their sworn duty to uphold the Iowa Constitution, but they should not be deviating from federal constitutional precedent simply to promote what the concurrence calls "cross-fertilization” or "vertical federalism."

. The majority more or less concedes in a footnote that this is a correct reading of its opinion. In other words, a parole agreement is a waste of time because none of it is enforceable. However, my colleagues leave open the possibility that other parole conditions might be valid, not because the parolee agreed to them, but because the State ordered them and they are “reasonable.” While I think such caveats are helpful, they do not afford the predictability needed in this area.

. As my colleagues note in their majority opinion, this very point has been made by the late Professor William Stuntz. William J. Stuntz, Implicit Bargains, Government Power, and the Fourth Amendment, 44 Stan. L. Rev. 553, 580-81 (1992).

. The concurrence pats this court on its back for doing the "hard work” of "[djeveloping a meaningful independent state constitutional analysis” instead of "simply matching] our constitutional cases against federal precedents.” I respectfully disagree. In my view, it is harder to work within an existing, well-developed line of authority, as courts generally do, than to branch off on one’s own on an ad hoc basis.